SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
ROBERT K. SAHYAN, Cal. Bar No. 253763
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947
Email:        okatz@sheppardmullin.com
              rsahyan@sheppardmullin.com

Proposed counsel for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re | Case No.    16-53499 |
| CECCHI GORI PICTURES, | Chapter 11 |
| Debtor. | |
| | **DECLARATION OF ANDREW DE CAMARA IN SUPPORT OF THE BANKRUPTCY FILING AND EARLY CASE ADMINISTRATION APPLICATIONS** |
| | Place:    United States Bankruptcy Court
                280 South First Street,
                Room  3035
                San Jose, CA 95113-3099 |

I, Andrew De Camara, declare:

1.      On the day of this declaration, Cecchi Gori Pictures ("CGP" or the "Debtor"), and its affiliate Cecchi Gori USA, Inc. ("CGUSA" and together with CGP, the "CG Entities," the "Companies" or the "Debtors"), each filed in this district a voluntary petition for relief under chapter 11 of title 11 of the United States Code, commencing a chapter 11 case (the "Bankruptcy Case").  I am authorized to submit this declaration in support of the Debtor's chapter 11 petition and the first day pleadings described here.

2.      I am a Senior Managing Director with Sherwood Partners, Inc.  I have 25 years of experience in strategic planning and financial planning including corporate restructurings, mergers & acquisitions and financial forecasting.  Prior to joining Sherwood in 2001, I was Vice-President of a B2B exchange for an Internet start-up and previously worked at a major Hollywood studio.

3.      During my career, I have served in various roles, including in business development and operational roles where I managed global sales teams, in a leading role managing fundraising activities for various privately held companies, as a court-appointed receiver, and as an officer of companies in a turnaround situation.  I have also been involved in various chapter 11 cases in different capacities, including as an officer or advisor of debtors and as an advisor to secured creditors and unsecured creditor committees.  I hold an M.B.A. from the University of Southern California and a B.A. from Georgetown University.

4.      I serve as the Companies' Chief Executive Officer and on their respective board of directors.  I was appointed to such position shortly before the bankruptcy filings. In such capacity, I am responsible for the management of the Companies' assets and financial affairs.  In connection with my appointment in such capacity, I have reviewed documents relevant to the Companies and had conversations with parties familiar with certain aspects of the Companies.

5.      I have met face-to-face with Niels Juul and have spoken to Mr. Juul on multiple occasions in connection with questions regarding the Companies.  Mr. Juul

-1-

previously served as an officer of the Companies during critical times, and I believe his willingness to work with me and his historical knowledge of the Companies will be critical to the success of these cases. I have similarly met in person with the co-liquidators of Nous S.r.l., a limited liability company organized under the laws of Italy ("Nous") and the ultimate parent of the Companies. The co-liquidators of Nous are intimately familiar with the events leading up to the filing of these cases.

6.     Except as otherwise noted, the matters described in this declaration are based upon my personal knowledge, my review of relevant documents and my discussions with Mr. Juul, representatives of Nous, and other parties with familiarity with the Companies, and if called as a witness, I would testify to such matters.

7.     I submit this declaration to provide relevant background information and assist the Court and other parties in interest in understanding the circumstances related to the commencement of this Bankruptcy Case and in support of the Debtor's voluntary petition for relief filed today (the "Petition Date") and the relief in the form of motions and applications (collectively, the "Motions") filed by the Debtor concurrently with this declaration, which are as follows:

(a)     *Ex Parte Application Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 Requesting Joint Administration of Chapter 11 Cases* (the "Motion for Joint Administration"); and

(b)     *Ex Parte Application for Order Extending Time to File Schedules, Statement of Financial Affairs, and Related Materials* (the "Motion to Extend Time").

8.     Unless otherwise stated, I give capitalized terms not defined in this Declaration the meanings given to them in the Motions. This Declaration addresses the Companies' background, their capital structure, the events leading to this bankruptcy filing, and the next steps for the Companies, followed by a discussion regarding each of the Motions listed above.

## THE COMPANIES' BACKGROUND

9.     The CG Entities are privately held companies that were formerly engaged in

the motion picture and entertainment businesses. CGP and CGUSA are California corporations incorporated in 1994 and 1991, respectively. CGUSA was initially incorporated under the name PentAmerica Communications, but changed its name to CGUSA in April 2000.

10. Attached to this declaration as Exhibit A is an organizational chart depicting the corporate structure of the Companies, which is as follows:

      a. The CG Entities are the wholly-owned subsidiaries of Cecchi Gori Group Europe B.V. ("BV"), a Dutch company.

      b. BV is the wholly-owned subsidiary of Promint Holdings S.A. ("Promint"), an entity organized in Luxembourg.

      c. Promint is the wholly-owned subsidiary of Nous, a limited liability company organized under the laws of Italy.

11. The above entities, in addition to other affiliated entities not listed above, were established and controlled by Vittorio Cecchi Gori ("VCG"), a former Italian film producer, businessman and politician, who was later convicted of financial crimes in an Italian court. As discussed further below, as a result of VCG's far-reaching fraud, the CG Entities have not operated for some time and have been dormant following the indictment and later the conviction of VCG. During their dormancy, the CG Entities had no headquarters, physical assets, or operations. In my capacity as CEO, I have established Sherwood's offices in Mountain View, California as the headquarters of the CG Entities, with operations to emanate from there and assets to be located there. I had no other viable option but to base the CG Entities out of Sherwood's office, given the poor state of affairs of the CG Entities resulting from their long-running victimization at the hands of VCG, in addition to the lack of a physical place of operations for the Debtors in recent years.

12. During the time that the CG Entities operated, they were involved in the production, co-production, financing, and development of motion pictures including several blockbusters such as *300*, *The Departed*, and *Seven*.

13. In the proceedings before the Italian court, the liquidation of the various

SMRH:223940386.4

assets and companies of VCG was ordered to satisfy the claims of his creditors. As part of that process, Nous was placed in a judicial liquidation proceeding (which I understand is similar to a bankruptcy proceeding in the United States), subject to the oversight of two court-appointed liquidators: Davide Franco and Sergio Torri. I have personally met with Messrs. Franco and Torri, along with their outside counsel.

14. Following their appointment, and as part of their efforts to recover assets, the co-liquidators commenced judicial proceedings in the United States to obtain control and complete ownership of the CG Entities. They filed an action in the California Superior Court for Los Angeles County, styled as *Nous S.r.l., Davide Franco, and Sergio Torri vs. Cecchi Gori Pictures, Cecchi Gori USA, Inc. Vittorio Cecchi Gori*, Case No. BC 466028, seeking declaratory relief, recognition of foreign country judgment, and appointment of receiver. In September 2016, they obtained a judgment from the court finding that Nous is the "ultimate and exclusive owner" of the Companies with the "right and power to directly control the operations and assets of the [Companies]." That judgment is now final. A true and correct copy of the judgment is attached to this declaration as Exhibit B, and is also attached to the resolutions authorizing the bankruptcy filing.

**PUTTING THE COMPANIES' BANKRUPTCY FILING INTO CONTEXT**

15. The necessity to file chapter 11 stems from the crimes committed by VCG. In order to understand the current state of affairs (including the Debtors' dire situation), what follows is a background discussed based on court filings (both foreign and domestic) and conversations I have had with persons involved and their counsel. This discussion is based on my information and belief, as opposed to my personal knowledge. I believe it is important because it puts in context the necessity of this filing and how I came to be CEO of the Debtors.

<u>The Crimes of VCG and the Mandate of Nous to Liquidate Assets</u>

16. Until recently, the Debtors had been owned or controlled by VGC since their founding. Historically VGC was the President/Chairman of the Board of Directors and sole shareholder of Cecchi Gori Group FIN.MA.VI SPA ("FINMAVI"), an Italian limited

SMRH:229940036.4

liability company. At its peak, FINMAVI operated more than 40 companies in the business of film production, distribution, exhibition, television multimedia, real estate, and professional soccer.

17. In his former role as sole shareholder of FINMAVI and certain other entities, VCG transferred funds from one entity to another entity within his control for his own personal benefit and to the detriment of creditors. For example, in or about 2002, VGC caused FINMAVI to transfer approximately $8,655,620 to Nous, $2,208,453.31 to CGP and $45,804,524.10 to CGUSA. These transfers ultimately became a loss of FINMAVI.

18. On November 7, 2005, FINMAVI filed a request for "composition with creditors" bankruptcy petition, which is the equivalent of a chapter 11 bankruptcy, before the Ordinary Court of Rome. In connection with the bankruptcy proceedings, VCG represented on behalf of FINMAVI that there was no possibility for FINMAVI to recover any assets from the CG Entities. VCG's statements to the Ordinary Court of Rome turned out to be untrue, as the CG Entities had substantial assets in the form of real estate and future revenues from films such as the blockbuster *300* and *Seven* produced by the CG Entities.

19. On October 23, 2006, the Ordinary Court of Rome, Bankruptcy Division, rejected the proposed reorganization and FINMAVI was declared bankrupt. As of the date of its bankruptcy, FINMAVI had more than $927 million in debt.

20. During the bankruptcy proceedings of FINMAVI, the Public Prosecutor of Rome began investigating VCG's activities and in 2007 charged VCG with bankruptcy fraud for fraudulent transfers and conveyances of FINMAVI's assets. To prevent VCG from continuing to transfer assets of entities he controlled, the Public Prosecutor of Rome in January 2008 requested issuance of a "preventative attachment" of the shares of Nous. On March 12, 2008, by order of the Ordinary Court of Rome, the assets of Nous were ordered the subject of a preventative attachment.

21. On July 25, 2008, the Court of Rome appointed Davide Franco as the official receiver of 100% of the shares of Nous. The court expressly ordered Franco to engage in

SMRH:229940236.4

1  due diligence in order to fulfill "all activities of ordinary preservation and administration

2  of the assets seized, as well as adopt all necessary precautionary measures."

3    22.    Thereafter, on July 30, 2008, Franco sought and received authorization from

4  the Court to assume management control over Nous and requested that Sergio Torri be

5  appointed Nous's legal officer.  On August 28, 2008, at an ordinary shareholder's meeting

6  of Nous, Franco was appointed the new sole director of Nous and Torri was appointed

7  Nous's legal officer, as authorized by the Court.

8    23.    In or about February 2010, following a petition by Franco, the Court of

9  Rome - 5th Criminal Division authorized an extraordinary shareholder's meeting of Nous

10  to vote on the liquidation and winding up of Nous and the appointment of liquidators.

11    24.    On March l, 2010, an extraordinary shareholders' meeting of the company

12  was held where it was resolved to liquidate Nous and to appoint Franco and Torri as co-

13  liquidators for the company, as authorized by the Court.

14    25.    Subsequently, Franco and Torri began an investigation of the assets of Nous'

15  subsidiaries, including the CG Entities.

16    **THE COMPANIES' CAPITAL STRUCTURE**

17    26.    Because of the acts and the conduct of VCG and prior management as

18  described above, it is not clear at this point what the exact liabilities and assets of the CG

19  Entities are.  The CG Entities, under their new management lead by me, will need to

20  review and analyze various documents and conduct an appropriate investigation to

21  determine the extent of such liabilities and assets.  Currently, the CG Entities have no

22  employees or management personnel other than myself.  As such, it is anticipated that such

23  investigation will require some time, approximately 46 to 60 days, to uncover the

24  information relevant to the assets and liabilities of the CG Entities.

25    27.    For the purpose of this filing, I am informed and believe that the CG Entities

26  main assets consist of certain intellectual property and other rights that appear to be of

27  significant value, in addition to approximately $148,000 in cash that was held in an escrow

28  with Commerce Escrow Company.  While an investigation and appropriate valuation have

SMRH:229940036.4

not been performed, it is anticipated that the value of the IP and other rights is likely to be several million dollars. The $148,000 of cash was held in escrow subject to an escrow agreement between the CG Entities and Nous. Escrow has released the funds to the client trust account of Debtors' proposed bankruptcy counsel. It is anticipated that a portion of such funds will be used as a retainer for proposed Debtors' counsel and as a portion of the compensation due to me for serving as the Debtors' CEO. The Debtors will be filing appropriate motions seeking Court approval of the use of such funds for such purposes.

28. As for liabilities, a preliminary investigation shows that the potential claims against the CG Entities consist of several claims, including those listed on the list of the 20 largest unsecured creditors. The 20 largest known unsecured claims total approximately $1.9 million. A recent lien search for each of the CG Entities shows a filing in favor of Nofatego, LLC, an entity owned by Mr. Juul, purporting to encumber substantially all the assets to secure compensation and other obligations that may have been due to Mr. Juul relating to a 2009 consultant agreement. In addition, the search shows a lien filing against the CG Entities by Clark & Trevithick PLC relating to a $121,446.57 judgment. Finally, with respect to CGUSA, the search shows a filing in favor of the Screen Actors Guild with a purported security interest over certain motion picture projects. Based on my discussions with Mr. Juul, I believe it is possible that there are only a handful of creditors of the Debtors.

**EVENTS LEADING TO THIS BANKRUPTCY FILING**

29. Because of the acts of the prior management of the CG Entities and the period of corporate dormancy (2 or 3 years) during which the CG Entities underwent a power struggle, there was a management vacuum where the CG Entities did not have any authorized person to act on their behalf and speak for them. This remained the case until my recent appointment shortly before the bankruptcy filing. Because no one knew what they would be stepping into if they joined the Companies as an officer or a director, the CG Entities were not able to re-build their management without the benefit of having the rules and the protection available in chapter 11 bankruptcy. As such, the CG Entities, as

SMRH:223944036.4

authorized by Nous as their exclusive owner, determined to file for bankruptcy protection.

## THE NEED FOR A CEO

30.     The Debtors are in the position of not having had a known headquarters, employees, bank accounts or physical assets for several years.  The Debtors have been a neglected company that has been pilfered by former insiders.

31.     The Debtors are primarily a bundle of non-tangible assets in need of management with relevant expertise to shepherd them through the process of monetizing such assets.  Given the nature of the assets involved (rights related to films), this required someone with film studio and intellectual property expertise, and a relevant network in the entertainment industry.  In addition, because this had to take place in chapter 11, the experience needed is one that involves familiarity with the bankruptcy process.  This is why I was brought in to this situation, and why I have offered to serve on the board of directors for the Companies and as their CEO.  Beginning with my involvement, the Debtors will use Sherwood's headquarters for their offices, and I will act as officer and director for the Debtors.

## NEXT STEPS FOR THE DEBTORS

32.     These bankruptcy cases were filed to recapture and monetize assets for the benefit of creditors and other parties in interest.  Some of those assets are in the form of valuable agreements related to films, film libraries and associated rights.  Other assets will be in the form of litigation claims, including against entities that took advantage of the power vacuum created by VCG's indictment and conviction.  Notwithstanding the misconduct of VCG individually, the brand name of "Cecchi Gori Pictures" itself has value, and it is believed that through careful operation during the bankruptcy cases a chapter 11 plan can be formulated, and the value of the Debtors can be rehabilitated through plan confirmation and an exit from bankruptcy.

33.     The Debtors' game plan will require the Debtors to navigate and operate within the world of film studios and Hollywood, and it will require industry specific expertise.  While I am in part stepping into an unknown situation, based on my experience,

SMRH:225944036.4

absent a chapter 11 bankruptcy filing, there would be no prospect for recovery for the creditors of the Debtors. By virtue of the chapter 11 filing and my involvement, as well as the involvement of Debtors' proposed counsel and others, I am optimistic that the Debtors can once again be operated so that the assets stolen or misappropriated from the Debtors can be recovered, monetized, and distributed in accordance with the Bankruptcy Code, and a chapter 11 plan can be confirmed allowing the Debtors to emerge as a reorganized entity.

## MOTION FOR JOINT ADMINISTRATION

34.     As stated above, the Debtors are affiliate entities that were formerly engaged in the same industry and concurrently filed chapter 11 bankruptcy petitions. Based on my review of the information available to the Debtors at this time, the list of creditors and other parties-in-interest in these cases are substantially the same. Many of the motions, hearings, and orders that will be filed in the Debtors' chapter 11 cases will almost certainly affect both Debtors. It is my view that the separate administration of the Debtors' cases will result in substantial duplication of pleadings and prosecution of matters, which would inevitably translate into significant cost, inefficiency and potential confusion.

35.     In the Motion for Joint Administration, the Debtors request entry of an order authorizing the joint administration of their chapter 11 cases for procedural purposes only as further described in that motion.

36.     Given the above, I believe that an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the U.S. Trustee and all parties-in-interest to monitor the chapter 11 cases with greater ease and efficiency, which will inure to the benefit of all interested parties, and will not harm the substantive rights of any party-in-interest.

## MOTION TO EXTEND TIME

37.     I am informed that applicable bankruptcy rules require chapter 11 debtors to file the schedules of assets and liabilities, the statement of financial affairs, and related documents (collectively, the "Schedules") within fourteen days of the Petition Date. As noted above, the Debtors have only recently re-established control over their corporate

affairs following extensive litigation that has been pending since 2011. Other than myself, the Debtors have no employees or other management personnel. Under their new management lead by me, the Debtors will need to review and analyze various documents and books and records and conduct an appropriate investigation to determine the extent of their assets and liabilities. As such, I anticipate that such investigation will require some time. As a result, I do not believe that the Schedules could accurately be completed by the fourteen-day deadline. It is my view that a forty-five day extension of the deadline will allow me, with the assistance of Debtors' counsel, to conduct a detailed review and then prepare and file accurate Schedules.

38. If the Court does not grant an extension of time, it is my view that I and Debtors' counsel would need to devote significant amounts of time and energy during the first fourteen days of the case to compiling Schedules that would be incomplete and potentially inaccurate. I believe that this effort would distract me and Debtors' counsel from addressing numerous legal and other challenges that are likely to arise during the early stages of these cases. On the other hand, if the Court grants the extension, the Debtors will have a better chance of filing the Schedules on time before the expiration of the new deadline.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 14, 2016, at Los Angeles, California.

Andrew De Camara

SMRH:225944036.4

# **EXHIBIT A**

# CG Entities
## Organizational Chart



# EXHIBIT B

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 08 2016

Sherri R. Carter, Executive Officer/Clerk
By Susana C. Ontiveros, Deputy

Received

AUG 2 9 2016

Default Section

RECEIVED

AUG 3 0 2016

DEPT 42

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| NOUS S.r.l., an Italian Limited Liability Corporation, DAVIDE FRANCO, as co-liquidator of NOUS S.r.l., and SERGIO TORRI, as co-liquidator of NOUS S.r.l. | Case No.: BC466028 |
| Plaintiffs, | *[Assigned for all purposes to the Honorable Holly E. Kendig]* |
| v. | ~~[PROPOSED]~~ JUDGMENT |
| CECCHI GORI PICTURES, a California corporation; CECCHI GORI USA, INC., a California corporation; VITTORIO CECCHI GORI, an individual; and DOES 1 through 10, inclusive, | Dept.: 42 |
| | Filing Date: July 25, 2011 |
| Defendants. | |

[PROPOSED] JUDGMENT

LEGAL02/36625523v1

**[PROPOSED] JUDGMENT**

On August 5, 2016, this Court issued an Order striking the answers filed by Defendants Cecchi Gori Pictures ("CGP"), Cecchi Gori USA, Inc. ("CGUSA", together the "CG Entities"), and Vittorio Cecchi Gori ("Gori") and entering all of the Defendants' defaults.

Plaintiffs Nous S.r.l. ("Nous"), Davide Franco, and Sergio Torri submitted an Application for Entry of Default Judgment as to all Defendants. The Application came on regularly for hearing on September 7, 2016. The Court, having considered the parties' papers, arguments of counsel and all other matters presented to the Court, and good cause appearing therefore,

**IT IS HEREBY ORDERED AND ADJUDGED THAT**:

Plaintiff Nous is the ultimate and exclusive owner of the CG Entities. It is further ordered and adjudged that Plaintiff Nous has the right and power to directly control the operations and assets of the CG Entities.

DATED:

SEP 0 8 2016

_____
Honorable Holly E. Kendig
Judge of the Los Angeles Superior Court

Case: 16-53499   Doc# 6   Filed: 12/14/16   Entered: 12/14/16 20:38:56   Page 16 of 16

LEGAL02/36625523v1