Michael H. Weiss (State Bar No. 107481)
mw@weissandspees.com
Laura J. Meltzer (State Bar No. 151889)
lm@weissandspees.com
WEISS & SPEES, LLP
6310 San Vicente Boulevard, Suite 401
Los Angeles, California 90048
Telephone: 424-245-3100
Facsimile: 424-217-4160

Attorneys for Creditor
Gabriele Israilovici

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| IN RE<br><br>CECCHI GORI PICTURES, CORPORATION, a California corporation, and CECCHI GORI USA, INC. a California corporation<br><br>    Debtors. | Case No. 16-53499<br>Administratively consolidated with Case No. 16-54500<br>Chapter 11<br>Judge: Hon. M. Elaine Hammond<br><br>**MOTION TO DISMISS CASE FOR CAUSE UNDER 11 U.S.C. §_1112 FOR CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing:<br>Date:       May 8, 2018<br>Time:      11:00 a.m.<br>Place:      Courtroom 3020<br>               280 So. First St.<br>               San Jose, CA 95113-3099 |

Creditor Gabriele Israilovici hereby moves this Court for an order dismissing this case for "cause" under 11 U.S.C. § 1112 ("section 1112") because there is either substantial or continuing losses to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation under section 1112(b)(4)(A), the inability to confirm a plan within a reasonable period of time or gross mismanagement of the estate under section 1112(b)(4)(B).

This motion is based on the accompanying Notice of Motion, attached Memorandum of

Points and Authorities, the accompanying request for judicial notice, the accompanying Declaration of Michael H. Weiss, the accompanying Appendix of Exhibits, the papers and pleading on file with this Court, and any argument or evidence presented at the hearing on this motion.

Dated: April 11, 2018
                    WEISS & SPEES, LLP
                    */s/ Michael H. Weiss*
                    Michael H. Weiss
                    Attorneys for Creditor Gabriele Israilovici

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION ...................................................................................................1

II. THE ORIGINS OF THESE CASES.......................................................................1

    A.  This bankruptcy case is simply a device for the shareholders to re-litigate mishandled claims of their affiliates to get the proceeds of the Nunnari Judgment. ..........1

    B.  The FinMaVi Bankruptcy ............................................................................2

    C.  The Nunnari Litigation and Its Settlement..................................................3

    D.  The Italian criminal court appoints the Nous liquidators to seize the proceeds of the Nunnari Judgment. ............................................................3

        1.  The corporate structure of VCG's Italian entities. ....................................3

        2.  The Sequestration Order ............................................................................4

        3.  Nous sues to gain control over the Debtors in the Superior Court. ..........4

        4.  Nous seeks a temporary restraining order and preliminary injunction. ....5

        5.  VCG and the Debtors default in the Nous litigation.................................5

III. STANDARDS FOR DISMISSAL FOR "CAUSE" UNDER SECTION 1112(B) ..........6

IV. CAUSE EXISTS FOR DISMISSAL OF THESE CASES UNDER SECTION 1112(B). ..........7

        1.  Cause exists because there is both (i) a substantial or continuing loss to or diminution of the estate and (ii) the absence of a reasonable likelihood of rehabilitation. ..........7

        2.  These Debtors have lost and continue to lose money. .................................7

        3.  There is no likelihood of rehabilitation.....................................................8

        4.  The Debtors cannot confirm a plan within a reasonable period of time. ..........10

    B.  The Debtors' inexplicable relationship with Mr. Juul, including undisclosed conflicts of interest, is gross mismanagement of these estates. ..........12

        1.  The Debtors' inadequate disclosures in connection with retention of Mr. Juul as a consultant ..........13

        2.  Mr. Juul's original role as CEO of the Debtors ....................................14

        3.  Mr. Juul's role in the Daro and Shiba transactions ................................15

        4.  **Mr. Juul's role in and payments received from the settlement of the Nunnari litigation** ..........**15**

**5.** The firing of Mr. Juul as CEO of the Debtors and his retention as an executive producer ...................................................................................16

6. Mr. Juul botches the preservation of the Debtors' rights in the Ferrari project in 2014. ..................................................................................17

7. VCG fires Mr. Juul as an executive producer for incompetence and misappropriating the Debtors' funds. .......................................................17

8. There has been no disclosure that the Debtors' counsel is representing Mr. Juul.**......................................................................................................18**

V. THE BEST INTERESTS OF CREDITORS IS SERVED BY DISMISSAL.................................20

VI. CONCLUSION.........................................................................................................22

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*3685 San Fernando Lenders, LLC v. Cross Equities Partners, LLC (In re USA Commer. Mortg. Co.)*, 452 F. App'x 715 (9th Cir. 2011) .................................................................8

*Bangor Punta Operations, Inc. v Bangor & A. R., Co.*, 417 U.S. 703 (1974)...........................13

*Bay Area Material Handling v. United States Tr. (In re Bay Area Material Handling*, 76 F.3d 384 (9th Cir. 1996) (unpublished) full text published at 1996 U.S. App. LEXIS 2272...........................................................................................................................................8

*Bono v. Clark*, 103 Cal.App.4th 1409 (2002) .........................................................................21

*Fuller v. First Franklin Financial Corp.*, 216 Cal.App.4th 955 (2013) ..................................21

*Hassen Imps. P'ship v. City of W. Covina (In re Hassen Imps. P'ship)*, 2013 Bankr. LEXIS 3870 (B.A.P. 9th Cir. Aug. 19, 2013) ...............................................................8

*Macedo v. Bosio*, 86 Cal. App. 4th 1044 (2001).......................................................................21

*In re 3 RAM, Inc.*, 343 B.R. 113 (Bankr. E.D. Pa. 2006). ......................................................11

*In re BTS, Inc.*, 247 B.R. 301 (Bankr. N.D. Okla. 2000 ..........................................................21

*In re Continental Holdings, Inc.*, 170 B.R. 919 (Bankr. N.D. Ohio 1994).............................20

*In re DB Capital Holdings, LLC*, Nos. 10-25805 MER, 10-36493 MER, 10-39584 MER, 2011 Bankr. LEXIS 4432 (Bankr. D. Colo. Nov. 14, 2011 ...................................20

*In re DCNC N.C. I, LLC*, 407 B.R. 651 (Bankr. E.D. Pa. 2009) .............................................11

*In re Depew*, 115 B.R. 965, 969 (Bankr. N.D. Ind. 1990) ......................................................21

*In re Great Am. Pyramid Joint Venture*, 144 B.R. 780 (Bankr. W.D. Tenn. 1992) ................20

*In re JMC Telecom LLC*, 416 B.R. 738 (C.D. Cal. 2009) .......................................................21

*In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707 (Bankr. D. Md. 2011).....................6

*In re Lizeric Realty Corp.*, 188 B.R. 499 (Bankr. S.D.N.Y. 1995).............................................9

*In re McKinney Ranch Associates*, 62 B.R. 249 (Bankr. C.D. Cal. 1986) ..............................19

*In re McTiernan*, 519 B.R. 8607 (Bankr. D. Wyo. 2014)..................................................12, 13

*In re Mense*, 509 B.R. 269 (Bankr. C.D. Cal. 2014).........................................................8, 20

*In re Prods. Int'l Co.*, 395 B.R. 101 (Bankr. D. Ariz. 2008) ..................................................13

*In re Stevens*, 2015 Bankr. LEXIS 1804 (June 1, 2015, Bankr. D. Mont.) .............................19

*In re Vallambrosa Holdings, LLC*, 419 B.R. 81 (Bankr. S.D. Ga. 2009)..................................8

*In re Woodbrook Assocs.*, 19 F.3d 312 (7th Cir. 1994). ...........................................................6

*Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831 (7th Cir. 1998).............19

*Loop Corp. v. U.S. Trustee*, 379 F.3d 511 (8th Cir. 2004) .......................................................9

*Neubauer v. Goldfarb*, 108 Cal. App. 4th 47 (2003) ...............................................................13

*Quarles v. United States Trustee*, 194 B.R. 94 (W.D. Va. 1996) ...........................................20

iii

## Statutes and Rules

11 U.S.C. § 101(2) ...........................................................................................................1

11 U.S.C. § 101(2) and (31) ...........................................................................................3

11 U.S.C. § 327(c) .........................................................................................................19

11 U.S.C. § 1112 .............................................................................................................1

11 U.S.C. § 1112(a)(4)(A) ..............................................................................................8

11 U.S.C. § 1112(b) .........................................................................................................6

11 U.S.C. § 1112(b)(1) ....................................................................................................8

11 U.S.C. § 1112(b)(1) and (2) .......................................................................................6

11 U.S.C. § 1123(b)(4) ....................................................................................................9

11 U.S.C. § 1112(b)(4)(A) ...................................................................................6, 7, 9, 11

11 U.S.C. § 1112(b)(4)(B). ..............................................................................................6

11 U.S.C. § 1112(b)(4)(K) ...............................................................................................7

28 U.S.C. § 1930(a)(6) ....................................................................................................7

Cal. Civ. Code § 3439.09(c) ..........................................................................................21

Cal. Code of Civ. Pro. § 338(a) .....................................................................................21

Cal. Penal Code § 496 of the ........................................................................................21

Fed. R. Bankr. Pro. 2014................................................................................................19

## Treatises

7 *Collier on Bankruptcy*, ¶1112.04 (16th ed. 2017) ....................................................12

7 *Collier on Bankruptcy* at ¶ 1112.04[7]. ....................................................................20

7 *Collier on Bankruptcy*, ¶ 1112.05[2] (16th ed. 2017)................................................6

HR Rep. No. 31, 109th Cong., 1st Sess. 442 (2005) ....................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES

Creditor Gabriele Israilovici submits the following memorandum of points and authorities in support of his motion to dismiss these cases for "cause" under section 1112 of the Bankruptcy Code.[1]

## I. INTRODUCTION

Creditor Gabriele Israilovici moves to dismiss the administratively consolidated bankruptcy cases of Cecchi Gori Pictures Corporation ("CGP") and Cecchi Gori USA, Inc. ("CGUSA") (collectively, the "Debtors") for cause under section 1112 because:

- The Debtors have experienced and continue to experience significant losses, and they cannot be rehabilitated because they will never return to their original business of developing and producing motion pictures;

- The Debtors cannot formulate and confirm a plan in a reasonable period of time because feasibility of any such plan turns on the successful resolution of multiple pieces of litigation both in this country and Italy that are years away from resolution; and

- The Debtors are being grossly mismanaged by their continuing association with Niels Juul who (i) has neither the connections nor skills to turn around the Debtors' miniscule portfolio of film projects, (ii) was involved in misappropriating money from the Debtors and (iii) was personally involved in several transactions for which the Debtors now seek damages on the grounds of fraud.

## II. THE ORIGINS OF THESE CASES

### A. This bankruptcy case is simply a device for the shareholders to re-litigate mishandled claims of their affiliates to get the proceeds of the Nunnari Judgment.

These case arises from the failed pursuit of the approximately $5.45 million of the proceeds of the "Nunnari Judgement" by Nous, S.r.l., Promint Holdings, S.A., and Cecchi Gori Group Europe B.V. (collectively, "Nous") the equity holder of the Debtors and its affiliates.[2] Those

---

[1] Unless otherwise noted, all reference to "section _____" refer to the applicable section of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

[2] The Debtors' equity holder is Cecchi Gori Group Europe B.V. That entity is wholly owned subsidiary of Promint Holdings, S.A., which is the wholly owned subsidiary of Nous S.r.l. Each of these entities is an "affiliate" of the Debtor under section 101(2).

parties spent over five years seeking those proceeds of that judgment in the Los Angeles County Superior Court (the "Superior Court"). Arguably, they "won" when the Debtors' CEO and director, Vittorio Cecchi Gori ("VCG") and the Debtors themselves defaulted and the Superior Court entered a judgment that held Nous to be the sole owner of the Debtors' equity. Despite years of effort and the expenditure of certainly hundreds of thousands of dollars in legal fees, the Debtors' equity holder "lost" because it recovered only about $200,000 from the proceeds of that judgment, all of which has been squandered on more legal fees in these cases. Nous commenced these cases in the hope of collecting those proceeds from Mr. Israilovici and others, who the Debtors' current management believes helped VCG hide those proceeds.

The Debtors' affiliates had every opportunity to join Mr. Israilovici and others in that case but failed to do so. The Debtors are using these bankruptcy cases as vehicles to re-litigate that case to obtain the same relief against Mr. Israilovici and others that BV and its affiliates might have otherwise obtained in the Superior Court. The story behind the Debtors' bankruptcy has been alleged in bits and pieces elsewhere in these cases and related adversary proceedings. Mr. Israilovici repeats the story again here to present a clear picture of why the Court should dismiss these cases.

### B. The FinMaVi Bankruptcy

VCG formed CGUSA and CGP in 1991 and 1994, respectively to acquire, develop and produce film projects in the United States. In 2005, VCG's holding company, Fallimento Spa Cecchi Gori Group Fin.Ma.Vi ("FinMaVi") filed the equivalent of a chapter 11 bankruptcy case in Rome, Italy with debts of over $927 million. Ex. "F" at pp. 100-101.[3] On October 23, 2006 because VCG had hidden substantial assets of FinMaVi, the Italian court rejected FinMaVi's proposed reorganization plan and appointed a receiver to liquidate FinMaVi. Id. at p. 101.

---

[3] The term "Ex. ___" refers to the exhibits in the Appendix of Exhibits filed herewith. The reference to "p.___" refers to the "Bates stamped underlined number in the lower right-hand corner of the Exhibit. Ex. "F" is the First Amended Complaint for Conversion etc. (the "FAC") filed in the action styled: *Cecchi Gori Pictures Corp., et al. v. Israilovici, et al.*, Adv. No. 17-5084 (the "Second Adversary Proceeding") [5084 Adv. Dkt. No. 24]. References to "[5084 Adv. Dkt. No. ___]" refer to the document associated with that document number in the Second Adversary Proceeding.

### C. The Nunnari Litigation and Its Settlement

Between 2006 and 2008, VCG discovered that the Debtors' former CEO, Gianni Nunnari ("Nunnari"), had diverted several film projects to his production company and terminated then Nunnari's employment in 2008. Nunnari sued for wrongful termination in the action styled: *Nunnari, et al. v. Cecchi Pictures, Inc., et al*, L.A. Sup. Ct. Case No. BC390245 (the "Nunnari Litigation"). VCG, the Debtor and CGUSA countersued alleging fraud, breach of fiduciary duty, and other claims.

The Nunnari Litigation proceeded for nearly three years and the Superior Court. On March 21, 2011, issued a statement of decision in favor VCG and the Debtors. That court reduced its statement of decision to a final judgment on May 9, 2011, when it entered judgment after a one-month trial against Nunnari in the amount of $13,226,125 plus interest and costs (the "Nunnari Judgment"). Ex. "B". After twenty months of post-judgment wrangling during which the Debtors seized about $200,000 from Nunnari, VCG, the Debtors and Nunnari finally settled the Nunnari Litigation on November 14, 2012. Under that settlement, Nunnari paid $5,450,000 million to CGUSA on November 19, 2012 (the "Nunnari Settlement"). Ex. "C" at p. 61.

### D. The Italian criminal court appoints the Nous liquidators to seize the proceeds of the Nunnari Judgment.

#### 1. The corporate structure of VCG's Italian entities.

FinMaVi had a complex corporate structure involving over 40 companies. The relevant parts of FinMaVi's corporate structure were as follows: VCG owned FinMaVi and Nous, S.r.l. ("Nous"). Nous owned all of the equity of Promint Holdings, S.A. ("Promint"). Promint owned all of the equity of BV, which was placed into liquidation in the Netherlands in 2003. Nous claimed that BV owned all of the Debtors' equity. Ex. "F" at p. 100. Each of Nous, Promint and BV are affiliates or insiders of the Debtors under section 101(2) and (31). However, VCG claimed that the equity of the Debtors had been transferred from BV to him personally in 2002. Ex. "D" at p. 70.[4]

---

[4]    Ex. "D" is Declaration of Vittorio Cecchi Gori dated September 20, 2013 without exhibits.

### 2. The Sequestration Order

After getting wind of the Nunnari Judgment, the Italian Public Prosecutor obtained a provisional remedy called a "sequestra preventive" from the Criminal Court of Rome (the "Sequestration Order"). Ex. "E".[5] Italian courts issue such orders if an asset related to the criminal proceeding might be hidden or used to commit other crimes.[6] In granting the Sequestration Order, the Criminal Court of Rome made the following findings:

- CGP owed €1,509,008.79 to FinMaVi and CGUSA owed €31,299,296.33 to FinMaVi, Ex. "E" at p. 89.

- VCG controlled the Debtors and he was either directly or through an "intermediary," likely to come into possession of the proceeds of the Nunnari Judgement, Id. at p. 90;

- If VCG came into possession of the proceeds of the Nunnari litigation, he was likely take the proceeds and not pay the FinMaVi bankruptcy estate's claims against the Debtors; Id.;

- As such, there was an imminent danger that the proceeds of the Nunnari Judgment would be diverted by VCG for his personal use thereby increasing the losses of the FinMaVi creditors, Id. at p. 93.

Based on these findings, the Criminal Court of Rome made the following order:

> pursuant to art. 321 of the Code of Criminal Procedures, it orders the preventive seizure of "an amount of moneys equal to the total amount of USD 13,786,465 that [Nunnari] must pay to the [Debtors], pursuant to the final judgment issued on 25 March 2011 by the judge Amy D. Hogue of the Superior Court of State of California"; pursuant to articles 92 and 104 of the Code of Criminal Procedure it orders the immediate restitution of the acts to the Public Prosecutor. Id.

### 3. Nous sues to gain control over the Debtors in the Superior Court.

To enforce the Sequestration Order, Nous filed the action styled: *Nous S.r.l v. Checchi*

---

[5] Ex. "E" was originally filed as part of the Appendix of Exhibits in support of Mr. Israilovici's objection to the FinMaVi Claim [CGP Dkt. No. 92] is the English translation of the Sequestration Order. "[CGP – Dkt. No. ____]" refers to the document associated with the docket number in *In re Cecchi Gori Pictures Corp.*, Case No. 16-53499. Likewise, "[CGUSA – Dkt. No. ____]" refers to the document associated with docket number in *In re Cecchi Gori USA Inc.*, Case No. 16-534500

[6] Declaration of Giovanni Nappi in Support of Objections to Claims of Fallimento Spa Cecchi Gori Group Fin.Ma.Vi [Claim 4-1] Against Cecchi Gori Pictures, etc. [CGP Dkt. No. 92-21 at p.3]

*Gori Picture*s, L.A. Sup., Case No. BC466028 (the "Nous Litigation") on July 25, 2011.  Ex. "F".[7]  Nous alleged that VCG would steal the proceeds of the Nunnari Judgment from the Debtors (Id. at p. 104) and sought a declaration that Nous, through Promint and BV, was the ultimate owner of the Debtors.[8]  Nous alleged that others (Does 1-10) would assist or had assisted VCG in stealing the proceeds of the Nunnari Judgment.  Id. at p. 99-100.

### 4.      Nous seeks a temporary restraining order and preliminary injunction.

To enforce the Sequestration Order, Nous filed the action styled:  *Nous S.r.l v. Checchi Gori Pictures*, L.A. Sup., Case No. BC466028 (the "Nous Litigation") on July 25, 2011.  Ex. "F".[9]  Nous alleged that VCG would steal the proceeds of the Nunnari Judgment from the Debtors (Id. at p. 104) and sought a declaration that Nous, through Promint and BV, was the ultimate owner of the Debtors.[10]  Nous alleged that others (Does 1-10) would assist or had assisted VCG in stealing the proceeds of the Nunnari Judgment.  Id. at p. 99-100.

### 5.      VCG and the Debtors default in the Nous litigation.

On April 16, 2016, counsel for the Debtors in the Nous litigation withdrew.  No new counsel appeared.  Likewise, counsel for VCG withdrew on May 3, 2016 and no new counsel appeared.  The Superior Court set a trial setting conference on May 4, 2016 and neither VCG nor the Debtors appeared.  That conference was continued until June 30, 2016.  Again, neither the Debtors nor VCG appeared.  At that time, the Superior Court set an OSC re Sanctions for Defendants' Failure to appear for August 2, 2016.  Again, neither VCG nor the Debtors appeared and the Superior Court struck the answers of VCG and the Debtors.  Ex. "I".

---

[7]   Exhibit "F" is a copy of the complaint in the Nous Litigation without exhibits.

[8]   BV was dissolved by the Dutch Chamber of Commerce on July 15, 2003.  In 2002, prior to the dissolution of BV, BV transferred its ownership interest in CGP and CGUSA to VCG, who became 100% owner of those entities.  Thus, since 2002, VCG has claimed that he owned all of the equity of CGP and CGUSA.  Ex. "D" at p. 70.

[9]   Exhibit "F" is a copy of the complaint in the Nous Litigation without exhibits.

[10]   BV was dissolved by the Dutch Chamber of Commerce on July 15, 2003.  In 2002, prior to the dissolution of BV, BV transferred its ownership interest in CGP and CGUSA to VCG, who became 100% owner of those entities.  Thus, since 2002, VCG has claimed that he owned all of the equity of CGP and CGUSA.  Ex. "D" at p. 70.

On September 8, 2016, the Superior Court entered a default judgment against VCG and the Debtors, which granted Nous control over the Debtors through BV. Ex. "J". On December 16, 2016, BV caused the Debtors to file these cases. Nous and its affiliates, BV and Promint, failed to accomplish their stated goal of obtaining control over the proceeds of the Nunnari Settlement. Having failed to do that directly, they filed these cases to recover those proceeds from Mr. Israilovici and VCG's lawyer, Giovanni Nappi, in the Second Adversary Proceeding.

## III.   STANDARDS FOR DISMISSAL FOR "CAUSE" UNDER SECTION 1112(B)

The Court must dismiss or convert a chapter 11 case under section 1112(b) if a creditor shows "cause," and the exceptions section 1112(b)(1) and (2) do not apply. *In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 711 (Bankr. D. Md. 2011). The moving party has the burden of going forward to establish cause by the preponderance of the evidence. See *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994)

The language of section 1112(b) provides that, if the moving party establishes one of the sixteen enumerated species of cause, the Court must dismiss or convert unless one of the exceptions in section 1112(b)(1) and (2) is present, i.e., the debtor can show (i) a plan will be confirmed within a reasonable time, (ii) the cause for dismissal or conversion is something besides a continuing loss or diminution to the estate without reasonable likelihood of rehabilitation, and (iii) the presence of either justification for the act or omission constituting cause and the act or omission will be cured within a reasonable time. *Landmark Atlantic Hess Farm*, 448 B.R. at 711; 7 *Collier on Bankruptcy*, ¶ 1112.05[2] (16th ed. 2017) ("Once the moving party has established cause, the debtor has the burden to demonstrate that one on the exceptions in section 1112(b) applies.") As discussed below, "cause" exists because there is either (i) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation under section 1112(b)(4)(A), (ii) the inability to confirm a plan within a reasonable period of time or (iii) gross mismanagement of the estate under section 1112(b)(4)(B).

## IV. CAUSE EXISTS FOR DISMISSAL OF THESE CASES UNDER SECTION 1112(B).

### 1. Cause exists because there is both (i) a substantial or continuing loss to or diminution of the estate and (ii) the absence of a reasonable likelihood of rehabilitation.

Under section 1112(b)(4)(A), cause exists if there is a "continuing loss to or diminution of the estate" and an "absence of a reasonable likelihood of rehabilitation[.]" *In re Citi-Toledo Partners*, 170 Bankr. 602, 606 (Bankr. N.D. Ohio 1994). Both requirements must be satisfied and they are satisfied here.

### 2. These Debtors have lost and continue to lose money.

On the petition date, December 16, 2016, the Debtors had the following sums in their accounts:

| | |
|---|---|
| CGP | $25,000.00 |
| CGUSA | $25,000.00 |

Ex. "K" at p. 151; Ex. "L" at p. 164.[11] As of January 31, 2018, only the following sums remain:

| | |
|---|---|
| CGP | $2,278.00 |
| CGUSA | $ 604.00 |

Ex. "K" at p. 151; Ex. "L" at p. 164. These sums are net of professional retainers of $107,306.50. [CGP – Dkt. No. 1 at p. 9, CGUSA – Dkt. No. 1 at p. 9] Thus, the estates have collectively lost $47,090.00 or about 95% of the cash they held on the Petition Date. By the time of the hearing on this Motion, CGUSA will have paid another $325 in U.S. Trustee fees due under 28 U.S.C. § 1930(a)(6). After that payment, CGUSA will not have enough cash to pay the next fee of at least $325 due on July 15, 2018. These losses will continue because U.S. Trustee fees must be paid. Failure to pay these fees is an independent basis for dismissal or conversion for cause under section 1112(b)(4)(K). In addition, the estates have accrued professional fees of at least $534,938 since the commencement of these cases through January 31, 2018. Ex. "K" at p. 151; Ex. "L" at p. 164.

---

[11] Ex. "K" is the CGP Monthly Operating Report "[CGP – Dkt. No. 141] for the month ending on January 31, 2018. Exhibit "L" is the CGUSA Monthly Operating Report for "[CGUSA – Dkt. No. 49].

This level of losses meets the requirements of section 1112(a)(4)(A). *In re Mense*, 509 B.R. 269, 284 (Bankr. C.D. Cal. 2014) ("Cause for dismissal or conversion of a chapter 11 case includes a substantial or continuing loss to or diminution of the estate ... . With respect to the first element, [t]here need not be a significant diminution in the estate to satisfy Section 1112(b)(1). All that need to be found is that the estate has suffered some diminution in value. In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow -- including that resulting only from administrative expenses -- effectively comes straight from the pockets of the creditors.") (citations and quotations omitted). Accord: *3685 San Fernando Lenders, LLC v. Cross Equities Partners, LLC (In re USA Commer. Mortg. Co.)*, 452 F. App'x 715, 724 (9th Cir. 2011); *Bay Area Material Handling v. United States Tr. (In re Bay Area Material Handling*, 76 F.3d 384 (9th Cir. 1996) (unpublished) full text published at 1996 U.S. App. LEXIS 2272. Importantly, "[t]he loss may be substantial or continuing. It need not be both in order to constitute cause under [section] 1112(b)(4)(A)." *Hassen Imps. P'ship v. City of W. Covina (In re Hassen Imps. P'ship)*, 2013 Bankr. LEXIS 3870, at *37 (B.A.P. 9th Cir. Aug. 19, 2013). In this case, the level of losses is substantial – over 95% of the Debtors' cash. The losses are continuing because the Debtors must continue to pay their quarterly U.S. Trustee's fees.

### 3. There is no likelihood of rehabilitation.

The Ninth Circuit BAP described the rehabilitation requirement in section 1112(a)(4)(A) as follows:

> Section 1112(b)(4)(A) also requires the bankruptcy court to find an absence of a reasonable likelihood of rehabilitation. The issue of rehabilitation for purposes of § 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort. Rehabilitation is a different and much more demanding standard than reorganization. *Hassen*, 2013 Bankr. LEXIS 3870, at *42 (emphasis added) (quotations and citations omitted).

Thus, "rehabilitation" means a revived operation of the Debtors' business of developing and producing motion pictures. *In re Vallambrosa Holdings, LLC*, 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009). Liquidation of Debtors' business may be permissible in a reorganization plan under

section 1123(b)(4). However, liquidation through a plan is not "rehabilitation" under section 1112(b)(4)(A). *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004)("Because the debtors here [intend] to liquidate their assets rather than restore their business operations, they [have] no reasonable likelihood of rehabilitation.")

To evaluate the likelihood of rehabilitation, the Court need not accept "visionary schemes that entail risk to creditors without any reasonable probability of success usually warrant prompt conversion to chapter 7." *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995) (" is intended to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation."). If anything qualifies as a "visionary scheme," it is the Debtors' hope of resurrecting a moribund motion picture company with a small "library" of scripts and projects with a dubious chain of title that represents the leftovers of the Debtors' assets after all of the best and easiest of projects have been produced.

There is simply no prospect of *rehabilitation*, i.e., return of the Debtors to their former business of developing and producing motion pictures:

 a) The Debtors have only $2,882.00 in cash, Ex. "K" at p. 151; Ex. "L" at p. 164.

 b) They possess no assets other than 33 scripts and projects recovered from G&G as fraudulent transfers.[12]

 c) Title to many of those recovered scripts and projects assets remains in doubt; Ex. "M";[13]

 d) The Debtors lack the funds to obtain a chain of title report for the scripts and projects needed to raise funds to develop those scripts and projects; Ex. N[14] at pp. 255;

---

[12] See Judgment Pursuant to Rule [70]54(b) Avoiding Fraudulent Transfer in *Cecchi Gori Pictures v. G&G Productions, LLC*, Adv. No. 17-05007 [5007 Adv. Dkt. No. 95] (the "First Adversary Proceeding"). References to "[5007 Adv. Dkt. No. ____]" refer to the document associated with that docket number in the First Adversary Proceeding.

[13] Ex. "M" is excerpts from the Declaration of Brian Berlandi [5007 Dkt. 32-1].

[14] Ex. "N" is excerpts from the Supplemental Declaration of Gabriele Israilovici in Support of Defendants' Opposition to Plaintiff's Motion For Partial Summary Judgment [5007 Adv. Dkt. No. 87] (Supp. Israilovici Decl. ¶¶ 14, 15, 20 and 2).

e) Those assets appear to be subject to a lien in favor of Fabrica for as much as $300,000 under section 550(b); Ex. "O"[15] at p. 261;

f) The Debtors have no employees, place of business or other operations. Instead, they have only Andrew De Camara, who has some experience in the development and production of motion pictures, but last worked in the motion picture business in 2001; Ex. "P"[16] at p. 266.

g) Given the changes in that business in the past 17 years, it is hard to see what use, if any, Mr. De Camara's experience from nearly 17 years ago might play in the Debtors' prospective ability to develop and produce motion pictures;

h) Mr. De Camara hired a "consultant," Niels Juul, who, like Mr. De Camara, has virtually no track record of developing and producing motion pictures outside of those already acquired by the Debtors; Ex. "Q"[17] at pp. 278-279,

i) Mr. Juul is tainted by his participation in the alleged misappropriation of $5,408,464.01 of the Debtors' assets in 2012 for which the Debtors have sued Messrs. Israilovici and Nappi in the Second Adversary Proceeding, (Ex. "A" at pp. 12-15) from which Mr. Juul pocketed between $580,000 and $745,000. Ex. "R"[18] at pp. 286 and Ex. "S"[19] at p. 332.

Given all of these factors, Gertrude Stein's unfortunate, inaccurate but nonetheless edifying expression about Oakland sums up the Debtors' ability to rehabilitate: "there is no there there."

### 4. The Debtors cannot confirm a plan within a reasonable period of time.

Section 1112(b)(4)(A) lists sixteen enumerated types of "cause." "The list is not

---

[15] Ex. "O" is Declaration of Gaston Pavlovich in Support of Defendants' Opposition to Plaintiff's Motion For Partial Summary Judgment [5007 Adv. Dkt. No. 86] (Pavlovich Decl. at ¶ 6).

[16] Ex. "P" is excepts from Declaration of Andrew De Camara in Support of Application for Interim and Final Orders Authorizing the Compensation Structure of the Debtors' Chief Executive Officer [CGP Dkt. No. 19-1] (De Camara Decl. ¶¶ 10-12).

[17] Ex. "Q" is the Declaration of Niels Juul in Support of Application for Interim and Final Orders Approving the Entry of an Agreement with the Debtors' Consultant [CGP Dkt. No. 22] (¶¶ 6-8).

[18] Ex. "R" is excerpts from Declaration of Gabriele Israilovici [5007 Adv. Dkt. No. 32-4]. (at ¶ 16)

[19] Ex. "S" is Declaration of Andrew De Camara in Support of Debtors': (I) Reply in Support of Order to Show Cause Why Preliminary Injunction, etc. [5007 Adv. Dkt. No. 39].

exhaustive and a court may find cause for other equitable reasons."  Inability to confirm a plan within a reasonable period of time is not an enumerated cause.  *In re DCNC N.C. I, LLC*, 407 B.R. 651, 665 (Bankr. E.D. Pa. 2009) ("However, courts have found that the inability to confirm a plan within a reasonable period of time can constitute cause for dismissal or conversion.  Fundamental bankruptcy policy continues to support the proposition that the inability to propose a feasible reorganization or liquidation plan provides cause for dismissal or conversion of a chapter 11 case on request of an interested party.")  That explicit ground was omitted by BAPCPA in 2005, however as one judge noted, that ground continues to have vitality especially in the context of this case:

> [W]here the debtor is not an operating company as here but merely holds an . . . asset, the loss or diminution prong of §1112(b)(4)(A) is not relevant and the old §1112(b)(2) remains the applicable grounds for cause.  I can discover no explanation for the elimination of §1112(b)(2) or (b)(3) ("delay that is prejudicial to creditors").  However, as the bankruptcy bill provision amending §1112 is titled "Expanded Grounds for Dismissal or Conversion and Appointment of Trustee," HR Rep. No. 31, 109th Cong., 1st Sess. 442 (2005) (emphasis added), and as the amended provision limits the court's discretion to refuse to dismiss or convert upon a finding of cause seemingly to lower the barrier to dismissal, it is unlikely that cause found under the prior case law based on grounds either not enumerated (e.g., bad faith) or no longer enumerated (e.g., inability to effectuate a plan) will not be cause under BAPCPA.  *In re 3 RAM, Inc.*, 343 B.R. 113, 118 n.14 (Bankr. E.D. Pa. 2006).

After almost 18 months in chapter 11, the Debtors have only $2,882 in cash and 33 scripts and projects that have uncertain, and potentially little, value.  The only other "asset" of these Debtors is their claims against Messrs. Israilovici and Nappi in Second Adversary Proceeding.  Those parties have moved to dismiss that case.  [5084 Adv. Dkt. No. 26]  Even if that adversary proceeding survives dismissal, there will be substantial proof issues that will require extensive and expensive discovery outside of the United States.  Further, there are substantial collection risks and expenses because Messrs. Israilovici and Nappi both reside in Italy.  Ex. "A" at pp. 9-10.

Given these uncertainties, confirmation within a "reasonable" period of time becomes a virtual impossibility in light of the following:

a)  The Debtors have no cash to pay administrative claims that now exceed $500,000.00 as of January 31, 2018 and as required by section 1129(a)(9)(A), Ex. "K" at p. 151; Ex.

11

"L" at p. 164;

b) There is no projectable revenue that would allow the Debtors to pay secured tax claims of the IRS of $64,766.50 for CGP and $76,566.72 for CGUSA;[20]

c) The uncertainty of the value of the assets received in connection with First Adversary Proceeding, especially in light of the Debtors' inability to pay for a chain of title report renders any valuation of them impossible, and as such, the Debtors could not meet the feasibility requirements of section 1129(a)(11), Ex. "N" at pp. 255.

d) The appeal of the judgment[21] for the avoidance of the transfers of the scripts and related projects to Messrs. Israilovici and Nappi and their company, G&G Productions, LLC makes marketing the assets represented by the avoided transfers immensely difficult;

e) Final resolution of the FinMaVi claims is at least a year away;[22] and

f) The uncertainty arising from the Court's overruling the objection of Mr. Israilovici to the FinMaVi claim, which would require the Court to reserve almost 90% of any distribution to unsecured creditors.[23]

**B.  The Debtors' inexplicable relationship with Mr. Juul, including undisclosed conflicts of interest, is gross mismanagement of these estates.**

"Gross mismanagement" is cause under section 1112(b)(4)(B).  The Bankruptcy Code does not define the term.  Mismanagement is to manage "ineptly, incompetently or dishonestly." "[G]ross is defined as glaring, flagrant, very bad." *In re McTiernan*, 519 B.R. 860, 867 (Bankr. D. Wyo. 2014).  Gross mismanagement under section 1112(b)(4)(B) is tied closely to the Debtors' fiduciary duty to their creditors.  7 *Collier on Bankruptcy*, ¶1112.04 (16th ed. 2017).  The inquiry under section 1112(b)(4)(B) centers upon a debtor's management of the estate's affairs during the

---

[20]  See CGP Claim No. 1 and CGUSA Claim No. 1.

[21]  5007 Adv. Dkt. No. 96.

[22]  Declaration of Guendalina Ponti [CGP Dkt. No. 130 at p. 5] (one to two years); Decoration of Etttori Notti [CGP Dkt. No. 108-1 at p. 7] (one to five years).

[23]  *Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 517 (9th Cir. 2007).  To be feasible for purposes of section 1129(a)(11), a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor.  The total amount of filed claims in the two estates after adjustment for duplicates is $26,825,456.01.  The total amount of the FinMaVi claims is $23,969,976.30.  The FinMaVi claims represent about 89.4% of all of the claims

chapter 11 case, including the quality and veracity reports made to the Court and creditors.  *In re McTiernan*, 519 B.R. at 866-67.  This requirement arises from a fiduciary's duty of candor.  *De La Fuente v. FDIC, 332* F.3d 1208, 1222 (9th Cir. 2003).  Thus, a debtor in possession must disclose it everything knows about a transaction.  *In re Prods. Int'l Co.*, 395 B.R. 101, 111 (Bankr. D. Ariz. 2008).  As fiduciaries, the Debtors must disclose new facts to the Court and creditors as they come to light.  *Neubauer v. Goldfarb*, 108 Cal. App. 4th 47, 66 (2003).  Finally, the Debtors, as fiduciaries, must also exercise "due care."  *Bangor Punta Operations, Inc. v Bangor & A. R., Co.*, 417 U.S. 703, 722 (1974).

These criteria make the Debtors' relationship to Mr. Juul inexplicable.  As discussed below, Mr. Juul has numerous conflicts of interest with these estates, has probably misappropriated money of the Debtors and has previously botched the handling of one of the few valuable assets that the Debtors have – the Ferrari project.  Mr. Israilovici disclosed these problems to the Debtors.  Ex. "R" at pp. 293-94.  Remarkably, the Debtors have made no disclosure of them to the Court and creditors; and they have not even tried to explain why they continue to ignore the problems with Mr. Juul's honesty and competence.  Yet, they persist in maintaining a relationship with Mr. Juul.  In so doing, the quality of the candor and due care imposed upon the Debtors as fiduciaries cannot be characterized as anything but "gross mismanagement."

### 1.    The Debtors' inadequate disclosures in connection with retention of Mr. Juul as a consultant

On December 19, 2016, the Debtors filed their Application for Interim and Final Orders Approving the Entry of an Agreement with the Debtors' Consultant [CGP Dkt. No. 20] whereby the Debtors sought to employ Mr. Juul as an independent contractor and consultant.  Under that agreement his proposed services were described as follows:

> Mr. Juul will serve as an independent contractor to assist the Debtors with respect to realizing value from company assets.  As part of Mr. Juul's obligations under the Term Sheet, he will use his contacts in the domestic and international entertainment industries and good faith, reasonable and best efforts to license rights in and to certain "Covered Projects" (as defined below in the Term Sheet) to third parties, and to assist in due diligence work related to estate assets and in the recovery of receivables and settlement funds owed to the Debtors. In rendering these services, Mr. Juul will facilitate negotiations in an attempt to maximize the

13

value of rights in and to the Covered Projects and facilitate the execution of customary documentation in connection with the license of available rights in and to the Covered Projects to third parties.  Id. at p. 4.

The application describes Mr. Juul's qualifications as follows:

Pursuant to a 2012 agreement, the Debtors permitted Mr. Juul and Nofatego to represent the Debtors on an exclusive basis in all aspects of negotiation, sales, financing, development, and production of certain scripts and motion picture projects in exchange for a forty percent commission of all funds received by the Debtors

... Mr. Juul will serve as an independent contractor to assist the Debtors with respect to realizing value from company assets. As part of Mr. Juul's obligations under the Term Sheet, he will use his contacts in the domestic and international entertainment industries and good faith, reasonable and best efforts to license rights in and to certain "Covered Projects" (as defined below in the Term Sheet) to third parties, and to assist in due diligence work related to estate assets and in the recovery of receivables and settlement funds owed to the Debtors. In rendering these services, Mr. Juul will facilitate negotiations in an attempt to maximize the value of rights in and to the Covered Projects and facilitate the execution of customary documentation in connection with the license of available rights in and to the Covered Projects to third parties.

Mr. Juul is unqualified to act in the capacity for which the Debtors have retained him  The disclosures about his past relationship with the Debtors are, at best, incomplete and, at worse, materially inaccurate.  The Debtor's disclosures fail to describe his crucial involvement in the alleged theft of over $5,450,000 of the proceeds of the Nunnari Judgment, his mishandling of the "Ferrari Agreement" with Michael Mann and his misappropriation of funds of the Debtors both as their CEO and later as an executive producer and his possible forgery of wire instructions to the Debtors' bank account.  The Debtors have been made aware of these problems with Mr. Juul. Nonetheless, the Debtors insist on maintaining and expanding their relationship with him without explanation to the Court and creditors.

## 2.    Mr. Juul's original role as CEO of the Debtors

While VCG was distracted by his legal problems in Italy, he discovered Mr. Nunnari, the Debtors' former CEO, had misappropriated a substantial amount of the Debtors' assets.  VCG, the Debtors' CEO, sole director and sole shareholder, asked his friend, Mr. Israilovici, to help him manage the Debtors' affairs in 2008.  Ex. "R" at p. 284.  Unable to take over full-time management of the Debtors, Mr. Israilovici recommended Mr. Juul to act as the CEO of the

Debtors because Mr. Juul could speak Italian, even though Mr. Juul had little experience in the movie business.  Id.

In 2009, the Debtors entered into a consulting agreement with Mr. Juul whereby he would as a temporary CEO, CFO and secretary of the Debtors.  Id.  Under that agreement, Mr. Juul received a one-time retainer of $50,000 and a monthly fee of $8,000.  He was also entitled to reimbursement of expenses provided that any charges over $1,000 were approved in advance.  He was also entitled to a commission of 10% for any film projects initiated or secured during his employment and 6.66% of all proceeds recovered in the Nunnari Litigation.  Id.

### 3. Mr. Juul's role in the Daro and Shiba transactions

In the Second Adversary Proceeding, the Debtors have sued Messrs. Israilovici and Nappi, but not Mr. Juul, for their alleged involvement in the disappearance of $808,484.01 of proceeds payable to CGUSA from Daro Film Distribution GmbH ("Daro") and the assignment of same to Shiba, Ltd.  Ex. "A" pp. 11-12.  None of the relevant documents appended to the FAC show any connection with either Mr. Israilovici or Mr. Nappi and the monies that the Debtors seek.  Rather, the attached documents show that Mr. Juul, who was the CEO of the Debtors at the time of these transactions, as having his hand all over the Daro and Shiba transactions.[24]  The Debtors disclosed none of his connections to the Daro and Shiba transactions in the papers in support of the application to employ Mr. Juul as a consultant.  [CGP Dkt. Nos.  19-20]

### 4. Mr. Juul's role in and payments received from the settlement of the Nunnari litigation

On November 14, 2012, the Debtors reached a settlement in the Nunnari Litigation under which Nunnari would pay $5,450,000 (the "Nunnari Settlement Payment") in full satisfaction of the Nunnari Judgment.  Ex. "C".  That settlement was signed by Mr. Juul as CEO of the Debtors.  Id. at p. 66.  Mr. Juul authorized wiring $4,599,980.00 derived from the Nunnari Settlement Payment to a Canadian entity called Pippin Management, Ltd. ("Pippin").  Ex. "S" at p. 332.  Of the $5,450,000 Nunnari Settlement Payment, it appears that Mr. Juul received between $580,000

---

[24]  See the "Daro Distribution Agreement" -- Ex. "A" at pp. 25-33 that identifies Mr. Juul as the person to receive notice under the agreement; the "Shiba Assignment," Id. at p. 35 that VCG signed; and the "Acknowledgement and Agreement" that Juul signed, Id. at p. 41.

and $745,000, even though he was entitled to only 6.66% of the gross settlement payment or $362,970 under his consulting agreement with the Debtors. Ex. "R" at 286. The Debtors have presented no documents that indicate that either Messrs. Israilovici or Mr. Nappi was involved in authorizing the payments to Pippin. Nonetheless, the Debtors have sued Messrs. Israilovici and Nappi in the Second Adversary Proceeding to recover that payment. Ex. "A" at p. 16. Conspicuously, they have not sued Mr. Juul even though he signed all of the authorizations for that payment, and he received substantially more than he was entitled to receive from that settlement payment under his consulting agreement with the Debtors. Even more problematic is that the Debtors' failure to disclose Mr. Juul's involvement in the authorization and receipt of a substantial portion of these payments in his employment application.

### 5. The firing of Mr. Juul as CEO of the Debtors and his retention as an executive producer

After having concerns about Mr. Juul's improperly reimbursing himself under his consulting agreement, VCG instructed Mr. Israilovici to terminate Mr. Juul as the CEO of the Debtors. Ex. "R" at p. 288. On December 15, 2012, Mr. Juul and the Debtors entered in an agreement styled: "Executive Producer Agreement" (the "EPA"). Id. Under that agreement, Mr. Juul agreed to act as an executive producer for the Debtors and to be compensated strictly on a commission basis. Id. The EPA also provides that Mr. Juul could "pursue opportunities for the production, co-production and/or development" of certain titles, including Ferrari, but that the Debtors "unilaterally reserve[d] the right to reject any proposals secured through his efforts" and retained the right to approve all material terms. Mr. Juul needed to obtain VCG's advance written approval as well. Id. at p. 309.

Despite being removed as the CEO, Mr. Juul was able, without the knowledge of Mr. Israilovici, to retain control over the Debtors' bank accounts (Ex. "R". at pp. 292) because VCG and Mr. Israilovici inadvertently failed to remove Mr. Juul as a signatory from the Debtors' bank accounts. Id. Again, the Debtors gave no explanation in Mr. Juul's employment application of the circumstances surrounding his termination as CEO of the Debtors.

### 6. Mr. Juul botches the preservation of the Debtors' rights in the Ferrari project in 2014.

On June 26, 2014, Mr. Juul entered into an agreement with director Michael Mann to develop the for the Ferrari project. Ex. "R" at pp. 292. Mr. Juul failed to obtain the permission of either Mr. Israilovici or VCG to enter into the agreement. Id. Further, the agreement provides that Mr. Juul would receive a "producer" credit instead of the less valuable "executive producer" credit as specified in the EPA. Id. The most notable flaw in the 2014 agreement with Mr. Mann was that Mr. Juul had allowed the option on the book upon which the Ferrari project was based to lapse. After that, Mr. Israilovici stepped in and paid $25,000 of his own funds to renew the option. Ex. at "N" at p. 257.

Mr. Israilovici then renegotiated the deal with Mr. Mann on more concrete and better terms to fix Mr. Juul's errors. The Debtors disclosed none of these problems with Mr. Juul's performance in either the employment application [CGP Dkt. No. 20 and 20-1] or in their recent Motion for Order Pursuant to 11 U.S.C. § 363 Authorizing the Debtors to Enter into Agreement with Forward Pass, Inc. Re Ferrari Project. [CGP Dkt. No. 146] Despite Mr. Juul's manifest shortcomings as a "producer," the Debtors continue to cling to Mr. Juul as "our man in Hollywood."

### 7. VCG fires Mr. Juul as an executive producer for incompetence and misappropriating the Debtors' funds.

On April 24, 2015, Mr. Juul wrote an email to VCG and Mr. Israilovici in which he, for the first time, asked VCG to approve expenses. He also said in this email that he wanted to get producer credit [for Ferrari], even though the EPA allowed him to get only an executive producer credit. Ex. "R" at pp. 292. Upset with Mr. Juul's demands, VCG terminated the EPA. Despite the termination, Mr. Juul refused to turn over control of the Debtor's bank accounts and books and records. Id. . Even worse, Mr. Juul continued to carry on as though he represented the Debtors. Id. at p. 290. As a result, VCG instructed Mr. Juul "once and for all you must stop anything you are doing in the names of the companies…" Id. at p. 292.

In October of 2015, Mr. Israilovici traveled again to Los Angeles to gain control of the

Case: 16-53499    Doc# 157    Filed: 04/11/18    Entered: 04/11/18 10:48:48    Page 23 of 28

accounts, books and records of the Debtors. Id. at p. 293. While there, he first learned through, the Debtors' accountant, that Mr. Juul had retained control over the Debtors' bank accounts at City National Bank. Mr. Israilovici identified a significant number of payments to that Mr. Juul had made to himself and his company, Nofatego, LLC, without permission from or notice being given to either Mr. Israilovici or VCG. Id.

On December 7, 2015, Mr. Israilovici engaged the services of KPMG, LLP to reveiw the Debtors' bank records for the period of January 1, 2012 to December 31, 2015. Id. On February 29, 2016, KPMG provided a report on the payments in and out of the Debtors' City National Bank accounts. Ex. "T". The report concluded that during the period of January 1, 2012 to December 31, 2015, no less than $1,335,264 was transferred from the Debtors directly to Juul or his company. Id. at p. 344. Further, it appears that Mr. Juul may have forged VCG's signature on some of the wire transfer authorization given to City National Bank. Ex. "U" at pp. 418-20. On December 19, 2016, VCG wrote a letter to the Debtors' management detailing these problems. However, the Debtors have not updated their disclosure in connection with Mr. Juul's employment application.

### 8. There has been no disclosure that the Debtors' counsel is representing Mr. Juul.

The Debtors' counsel now represents Mr. Juul in connection with the First Adversary Proceeding. Ex. "V"[25] at p. 423. Mr. Israilovici assumes that the Debtors consented to representation of Mr. Juul. However, neither the Debtors nor their counsel has disclosed this representation to the Court. This is a serious breach of protocol.

Section 327(a) governs the employment of the Debtors' lawyer to represent the bankruptcy estate. The Code authorizes employment of lawyers only if the lawyers do not represent an "interest adverse to the estate" and are "disinterested persons," as defined in section 101(14). An "interest adverse to the estate" has been defined as "any economic interest that would tend to lessen the value of the bankruptcy estate (*In re Stevens*, 2015 Bankr. LEXIS 1804 at *29 (June 1,

---

[25] Exhibit "V" is an email from the Debtors' counsel to the undersigned dated November 6, 2017 in which counsel states: "We wanted to advise that we will be representing Mr. Juul in connection with the subpoenas you have issued." Id. at p. 422-23

Case: 16-53499    Doc# 157    Filed: 04/11/18    Entered: 04/11/18 10:48:48    Page 24 of 28

2015, Bankr. D. Mont.) or one that would create either an actual or potential dispute," or "a predisposition under circumstances that render such bias against the estate." *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 835 (7th Cir. 1998). Representing a creditor claim such as Mr. Juul represents the classic adverse interest.

Shortly after the filing of their bankruptcy petition, the Debtors' counsel filed an employment application in which it represented to the Court that it was a "disinterested person." [CGP Dkt. No. 38 at p. 10] Nevertheless, under Fed. R. Bankr. Pro. 2014, the Debtors' counsel must update its employment application if a "new" conflict arises. Mr. Juul is a creditor. He had filed his claims in each case and those claims appear to be disputed on the Debtors' schedules. Thus, the Debtors' lawyers must update and amend their disclosures to show they represent a creditor.

However, section 327(c) provides an exception to the rule that the Debtors' lawyer cannot represent an "adverse interest." That subsection provides:

> a [lawyer] is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

Even absent an actual conflict of interest, the Court may still disqualify a lawyer representing the estate and one of its creditors simultaneously. Counsel for debtor in possession or trustee under section 327 should not simultaneously represent claimants against or transferees of estate since it is duty of counsel to search for property of estate, defenses to claims, preferential transfers, fraudulent conveyances and other causes of action that may yield recovery to estate, and counsel may overlook asset or defense of estate. *In re McKinney Ranch Associates*, 62 B.R. 249, 255 (Bankr. C.D. Cal. 1986) ("The policy behind disqualification for representing potentially conflicting interests provides the key to its extent. The jaundiced eye and scowling mien of counsel for the debtor should fall upon all who have done business with the debtor recently enough to be potential targets for the recovery of assets of the estate. The representation of any such party disqualifies counsel from representing a debtor.")

Here, Mr. Juul was intimately involved in the Nunnari Litigation, received payments in

connection with the Nunnari Settlement Payment, authorized the Pippin payment and has apparently misappropriated property of the Debtors. If nothing else, the conflict should have been disclosed and creditors should have been given an opportunity to object. Mr. Juul's history with the Debtors is riven with incompetence, conflicts of interest and misappropriations. The Debtors' present management has known of these problems since the inception of these cases and simply ignores them by continuing the Debtors' association with Mr. Juul and allowing their counsel to represent him. That continued association in the face of these problems is flagrantly inept, incompetent or dishonest -- the very essence of gross mismanagement that is cause to dismiss or convert under section 1112(b)(4)(B).

## V. THE BEST INTERESTS OF CREDITORS IS SERVED BY DISMISSAL.

If cause exists, the decision whether to convert or dismiss is subject to the Court's discretion with an eye towards the best interest of creditors. *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992). The Bankruptcy Code does not define the phrase "best interests of creditors and the estate." Presumably, the parties will be the best judge of their own best interests, and if all of the parties agree on one course of action, the court should accommodate their desire. On the other hand, the test is not simply majority rule. 7 *Collier on Bankruptcy* at ¶ 1112.04[7]. "The element of the best interest of the estate focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy." *In re Mense*, 509 B.R. at 285. The decision is essentially a balancing test. E.g., *Quarles v. United States Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996).

On one hand, courts have compared the rights of creditors under chapter 7 to their rights under non-bankruptcy law if the case were dismissed. *In re Continental Holdings, Inc.*, 170 B.R. 919, 928 (Bankr. N.D. Ohio 1994). Where rights can just as easily be pursued outside of bankruptcy, the test tips in favor of dismissal. Likewise dismissal may be preferred if there is little or no cash to pay a trustee's administrative expenses. *In re DB Capital Holdings, LLC*, Nos. 10-25805 MER, 10-36493 MER, 10-39584 MER, 2011 Bankr. LEXIS 4432, at *12 (Bankr. D. Colo. Nov. 14, 2011) ("Even if a trustee, with no funds to support litigation, manages to recover any assets from potential lawsuits, any such assets would be consumed by the cost of litigation

Case: 16-53499   Doc# 157   Filed: 04/11/18   Entered: 04/11/18 10:48:48   Page 26 of 28

and would, in any event, go primarily (if not only) to [the secured creditor], the only substantial creditor in the case. In such a circumstance, a trustee might well decide to abandon recovery efforts to the Debtors ..."). On the other hand, courts tend to prefer conversion after taking into account the effect of section 349 on the parties' rights if the case is dismissed. *In re Depew*, 115 B.R. 965, 969-74 (Bankr. N.D. Ind. 1990). Likewise, conversion might be preferred if an independent trustee needs to evaluate the estate's litigation claims. *In re BTS, Inc.*, 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000).

Here, considerations supporting either result are present.[26] However, Mr. Israilovici believes that dismissal best serves the interests of creditors. The claims in the Second Adversary Proceeding can be pursued just as easily outside of bankruptcy as in it. If the Debtors are correct that the equitable tolling preserves the estate's state-based claims against Mr. Israilovici and Mr. Nappi,[27] through the filing of these cases, then dismissal will not affect those claims. Likewise, as to any fraudulent transfers claims, creditors can still pursue those claims if they wish to do so because the statute of limitations in California Civil Code § 3439.09 has not run on the intentional fraudulent transfers alleged in the Second Adversary Proceeding.[28] Even as to the constructive fraudulent transfer claims, equitable tolling would allow creditors to pursue those claims if they wished.[29] With respect to already avoided transfers in the First Adversary Proceeding, they are

---

[26] Mr. Israilovici recognizes that dismissal will benefit him because the dismissal will cause the unwinding of the avoidance of the assets transferred to G&G section 349(b)(1)(B). Likewise, he recognizes that given that many of the claims asserted are against him, an independent trustee might be able to make a more dispassionate review of those claims than the present management of the Debtors.

[27] In the FAC, the Debtors claim that could not have discovered the claims against Mr. Israilovici and Mr. Nappi until after the commencement of these cases. Ex. "A" at p. 7. Since all of the relevant statute of limitations are three years from discovery. *Fuller v. First Franklin Financial Corp.*, 216 Cal.App.4th 955, 963 (2013) (breach of fiduciary duty); *Bono v. Clark*, 103 Cal.App.4th 1409, 1433 (2002) (conversion with concealment). For the receipt of stolen goods claims, section 338(a) of the Code of Civil Procedure provides for a three-year limitation because the claim arises out of a statute, *i.e.*, section 496 of the Penal Code. Thus, the three-year statute of limitation would expire sometime during the fall of 2019.

[28] The relevant transfers occurred in 2012. Ex. "A" at pp. 11-15. Thus, they would not be barred under the statute of repose in Cal. Civ. Code § 3439.09(c).

[29] *In re JMC Telecom LLC*, 416 B.R. 738, 743 (C.D. Cal. 2009) citing *Macedo v. Bosio*, 86 Cal. App. 4th 1044, 1051-52 (2001). ("Appellant is correct that he can re-frame his allegations as a common law claim and that § 338(d) can then supplant the four-year or one-year-post-discovery statute of limitations in § 3439.09(a).")

illiquid, difficult to market (Ex. N" at pp. 255-57), are being appealed (5007 Adv. Dkt. No. 96) and potentially subject to a lien under section 550(b).  Ex. "O" at p. 262.  Finally and most importantly, a conversion would require a chapter 7 trustee and her professionals to pursue these uncertain and highly disputed these claims with no cash.

## VI.    CONCLUSION

Multiple causes exist to dismiss these cases under section 1112.  Given the totally illiquid assets of the Debtors, the potential to pursue the estates' claims outside of bankruptcy and the absence of any cash whatsoever to pay the trustee and her professionals, Mr. Israilovici submits that dismissal is in the best interests of creditors.

Dated:  April 11, 2018

WEISS & SPEES, LLP
/s/ *Michael H. Weiss*
Michael H. Weiss
Attorneys for Creditor and Moving Party
Gabriele Israilovici

Case: 16-53499    Doc# 157    Filed: 04/11/18    Entered: 04/11/18 10:48:48    Page 28 of 28