WEISS & SPEES LLP
Michael H. Weiss (SBN 107481)
mw@weissandspees.com
Laura J. Meltzer (SBN 151889)
6310 San Vicente Boulevard, Suite 401
Los Angeles, California 90048
Telephone: 424-245-3100
Facsimile: 424-217-4160

Attorneys for Creditor Gabriele Israilovici

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| CECCHI GORI PICTURES, a California corporation;  CECCHI GORI USA, INC., a California corporation,<br><br>Debtors. | Bank. Case No.: 16-53499<br>(Jointly Administered with Case No. 16-53500)<br>Judge: Hon. M. Elaine Hammond<br>Chapter 11<br><br>**APPENDIX OF EXHIBITS IN SUPPORT GABRIELE ISRAILOVICI'S MOTION TO DISMISS BANKRUPTCY CASE FOR CAUSE UNDER SECTION 1112 OF THE BANKRUPTCY CODE**<br><br>Hearing:<br>Date:     May 8, 2018<br>Time:    11:00 a.m.<br>Place:   Courtroom 3020<br>        280 So. First St.<br>        San Jose, CA 95113-3099 |

s:\g+g prods\section 1112 motion\appendix of exhibits v.3.docx

Creditor Gabriele Israilovici submits the following Appendix of Exhibits in support of his Motion to dismiss this case for cause under 11 U.S.C. § 1112 ("section 1112"):

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | Complaint for: (1) Conversion (2) Breach of Fiduciary Duty (3) Treble Damages Under California Penal Code §§ 496 (A) and (C) (4) Avoidance and Recovery of Actual and Intentional Fraudulent Transfers; and (5) Avoidance and Recovery of Constructive Fraudulent Transfers | 4-55 |
| B | Amended [Nunnari] Judgement in L.A. Sup. Ct. Case No. BC390245 dated 5/9/2011 | 56-59 |
| C | [Nunnari] Settlement Agreement and Release dated 11/14/2012 | 60-67 |
| D | Declaration of Vittorio Cecchi Gori in support of Defendant's Motion for Summary Adjudication of Plaintiffs' Causes of Action for Declaratory Relief, Recognition of a Foreign Country Judgment, and Appointment of a Receiver, dated 9/20/2013 in Case No. BC466028 | 68-87 |
| E | English translation of Sequestration Order of the Criminal Court of Rome dated 4/21/2011 in Case Nos. 44838/06 and 27226/08 | 88-94 |
| F | Complaint for Declaratory Relief, Recognition of a Foreign Country Judgment, and Appointment of a Receiver in L.A. Sup.Ct. Case No. BC466028 without exhibits | 95-109 |
| G | Plaintiffs' *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Re Issuance of Preliminary Injunction; Memorandum of Points and Authorities in Support Thereof, L.A. Sup. Ct. Case No. BC466028 dated 1/9/2013 | 110-129 |
| H | Order Granting Plaintiffs' Ex Parte Application For Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction, L.A. Sup. Ct. Case No. BC466028 dated 1/13/2013 | 130-133 |
| I | Notice of Order Striking Answers and Entering Defaults, L.A. Sup. Ct. Case No. BC466028 dated 8/10/2016 | 134-144 |
| J | Judgement, L.A. Sup. Ct. Case No. BC466028 dated 9/8/2016 | 145-149 |
| K | Monthly Operating Report, Case No. 16-53499, dated 3/13/2018 | 150-162 |
| L | Monthly Operating Report, Case No. 16-53500, dated 3/13/2018 | 163-175 |
| M | Declaration of Brian L. Berlandi in Adv. No. 17-05007, dated 2/20/17 | 176-249 |
| N | Supplemental Declaration of Gabriele Israilovici in Support of Defendants' Opposition to Plaintiff's Motion For Partial Summary Judgment in Adv. No. 15-05007, dated 12/4/2017 | 250-258 |
| O | Declaration of Gaston Pavlovich in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment in Adv. No. 15-05007, dated 12/4/2017 | 259-262 |
| P | Declaration of Andrew De Camara in Support of Application for Interim and Final Orders Approving the Entry of an Agreement with the Debtors' | 263-274 |

2

| | | | |
|---|---|---|---|
| | | Consultant in Case No. 16-53499, dated 12/19/2016 | |
| | Q | Declaration of Niels Juul in Support of Application for Interim and Final Orders Approving the Entry of an Agreement with the Debtors' Consultant in Case No. 16-53499, dated 12/19/16 | 275-280 |
| | R | Declaration of Gabriele Israilovici in Adv. No. 17-05007, dated 2/20/2017 with Exhibits 1, 5,6, 12, 14 and 15 | 281-328 |
| | S | Declaration of Andrew De Camara in Support Of Debtors': (I) Reply in Support of Order to Show Cause Why Preliminary Injunction Should Not be Issued; and (II) Opposition to Motion to Quash Issuance of Writ of Attachment Against Defendants G&G Productions, LLC and Gabriele Israilovici | 329-341 |
| | T | Declaration of Filippo Puglisi Alibrandi in Adv. No. 05007, dated 2/20/2018 | 342-416 |
| | U | Outgoing Wire Transfer Requests dated 10/19/2012, 10/7/2013, 12/4/2014, | 417-421 |
| | V | Emails between Steven Sacks and Michael H. Weiss, 11/6/2017 to 11/8/2017 | 421-423 |

Dated:  April 11, 2018

WEISS & SPEES, LLP
/s/ *Michael H. Weiss*
Michael H. Weiss
Attorneys for Creditor Gabriele Israilovici

Case: 16-53499    Doc# 160    Filed: 04/11/18    Entered: 04/11/18 11:03:15    Page 3 of 59

# EXHIBIT A

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
STEVEN B, SACKS, Cal. Bar No. 98875
ROBERT K. SAHYAN, Cal. Bar No. 253763
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone:    415-434-9100
Facsimile:    415-434-3947
Email:    okatz@sheppardmullin.com
          ssacks@sheppardmullin.com
          rsahyan@sheppardmullin.com

Counsel for Debtors and Plaintiffs


UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| CECCHI GORI PICTURES, a California corporation; CECCHI GORI USA, INC., a California corporation, <br><br> Debtors, | Bank. Case No.: 16-53499 (Jointly Administered with Case No. 16-53500) <br><br> Chapter 11 |
| CECCHI GORI PICTURES and CECCHI GORI USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> GABRIELE ISRAILOVICI, an individual, GIOVANNI NAPPI, an individual, and KLAGI LIMITED (a/k/a KLAGI MANAGEMENT LIMITED and KLAGI LTD.), a Hong Kong corporation <br><br> Defendants. | Adv. Case No.  17-05084 <br><br> **AMENDED COMPLAINT FOR:** <br> **(1) CONVERSION** <br> **(2) BREACH OF FIDUCIARY DUTY** <br> **(3) TREBLE DAMAGES UNDER CALIFORNIA PENAL CODE §§ 496 (a) AND (c)** <br> **(4) AVOIDANCE AND RECOVERY OF ACTUAL AND INTENTIONAL FRAUDULENT TRANSFERS; AND** <br> **(5) AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS;** |

Plaintiffs CECCHI GORI PICTURES, a California corporation ("CGP"), and CECCHI GORI USA, INC., a California corporation ("CGUSA" and together with CGP, the "Debtors" or "Plaintiffs") hereby allege and complain against Gabriele Israilovici, an individual ("Israilovici"), Giovanni Nappi, an individual ("Nappi"), and Klagi Limited (a/k/a Klagi Management Limited and Klagi, Ltd.), a Hong Kong corporation ("Klagi Limited" and collectively with Nappi and Israilovici, "Defendants"), as follows:

## INTRODUCTION

1.      Until September 2016, the Debtors were under the control and dominion of Vittorio Cecchi Gori ("Gori"), a former Italian film producer, businessman and politician who was convicted of financial crimes in Italy, and Israilovici and Nappi. After a five-year battle between Gori and the liquidators of Nous S.r.l. ("Nous") who claimed the right to control the Debtors, Gori, Israilovici, and Nappi lost the right to manage and control the Debtors under a state court judgment entered in September 2016. Since then, the Debtors, under new management, have been investigating the actions of Gori and his associates to determine why the Debtors were only empty shells by September 2016 and what happened to the assets they previously had. Toward that end, the Debtors filed this bankruptcy case in December 2016 and brought an adversary proceeding against Gori, Israilovici, and Nappi in connection with the transfer of the Debtors' operating assets in 2015 to a company controlled by Israilovici and Nappi (Adv. Case No. 17-05007). In that action the Court has entered a judgment in favor of the Debtors, which (i) holds that the transfer was constructively fraudulent, (ii) avoids the transfer, and (iii) recovers the transferred assets.

2.      The Debtors have now investigated transfers of the Debtors' non-operating assets (primarily liquid funds) to Israilovici and Nappi, and their entities, including Klagi Limited, and bring this action to recover such transfers and obtain damages on account of Defendants' fraudulent transfers, theft, conversion, and breach of fiduciary duty.

3.　　　Nous was the ultimate parent of the Debtors and was formerly owned by Gori.  As a result of Gori's misconduct, the Italian Court placed Nous in a judicial liquidation proceeding, subject to the oversight of two court-appointed liquidators:  Davide Franco and Sergio Torri.  As part of their efforts to recover assets, in 2011 the co-liquidators commenced judicial proceedings in the United States to obtain control and complete ownership of the Debtors.  They filed an action in the California Superior Court for Los Angeles County (the "California Court"), styled as *Nous S.r.l., Davide Franco, and Sergio Torri vs. Cecchi Gori Pictures, Cecchi Gori USA, Inc. Vittorio Cecchi Gori*, Case No. BC 466028 (the "Nous Action"), seeking declaratory relief, recognition of foreign country judgment, and appointment of a receiver.

4.　　　In September 2016, the co-liquidators obtained a final judgment from the California Court finding that Nous is the "ultimate and exclusive owner" of the Debtors with the "right and power to directly control the operations and assets of the [Debtors]." Until Nous took over management and control of the Debtors, it had no knowledge of the transfers and conduct referred to herein and no ability to learn of such actions, as it lacked access to records of the Debtors' business transactions and the communications by Israilovici and Nappi concerning the transfers of the Debtors' assets.  Moreover, regardless of the state of Nous' knowledge of such transfers prior to September 2016, the Debtors remained powerless to act because they were under the control of Gori, Nappi, and Israilovici.  Since learning of these actions upon gaining control of the Debtors, the Debtors' new management and their counsel have diligently continued their investigation and initiated extensive discovery to determine the extent of the Defendants' wrongdoing. The Debtors bring this lawsuit after only recently gathering sufficient information to support the allegations herein.

5.　　　At all times prior to the entry of the judgment in the Nous action, a very close relationship existed among Gori and Israilovici and Nappi such that Israilovici and Nappi had authority to act on behalf of Gori with regard to the Debtors prior to the Petition Date (as defined below).  Gori delegated to Israilovici and Nappi substantial

control and decision-making authority with respect to the business of the Debtors, and Nappi acted as long-time personal counsel to Gori and also as counsel to the Debtors. Israilovici and Nappi acted in these respective capacities and had control over the Debtors at all times relevant to this Complaint. Both Israilovici and Nappi are "insiders" of the Debtors as that term is defined in the United States Bankruptcy Code (the "Bankruptcy Code").

6. On multiple occasions, Israilovici and Nappi have stolen funds from the Debtors and moved those funds through multiple opaque, foreign-registered entities under their control to shield their role as beneficiaries of the transfers. These entities did no business with the Debtors and had no claims on or rights to the Debtors' assets. The transfers occurred while the ownership of the Debtors was being litigated in the Nous Action and at times when some unsecured creditors, such as the Internal Revenue Service and the law firm of Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, had allowable claims, which creditors also had such claims as of the Petition Date.

7. As a result of litigation with a former business partner (the "Nunnari Litigation"), the Debtors received several million dollars in a settlement. Israilovici and Nappi took these monies from the Debtors for their own benefit via multiple transfers through entities that they created and/or controlled, including Klagi Limited. A portion of these stolen funds was used by Klagi Limited to purchase a condominium in Miami Beach, Florida, in the name of an LLC controlled by Israilovici and Nappi. That condominium was later sold and the proceeds were distributed to an entity controlled by Israilovici and Nappi.

8. Israilovici and Nappi also stole funds from the Debtors in connection with an agreement that CGUSA entered into in March of 2012 with Daro Film Distribution GmbH, a company formed under the laws of Switzerland ("Daro"). Pursuant to the agreement, Daro agreed to make certain payments to CGUSA in exchange for the rights to distribute certain of CGUSA's film assets. Instead of having the Debtors receive these payments, Israilovici and Nappi directed Daro to pay them to shell entities they controlled,

first to a company called Shiba Limited ("Shiba"), and later to an entity called Pippin Management Limited ("Pippin").

9.      The monies stolen by Israilovici and Nappi were funneled at Israilovici and Nappi's direction from Pippin and Shiba to other shell companies under their ultimate control. Defendant Klagi Limited was the recipient of the majority of the transfers (over $4 million), with the stolen funds in turn used for the benefit of Defendants or further transferred at their direction, including to purchase a condominium in Miami in the name of a shell entity owned by Israilovici and Nappi and managed by Israilovici.

## JURISDICTION AND VENUE

10.     This is an adversary proceeding pursuant to 11 U.S.C. §§ 541(a)(1), 544, 548 and 550.

11.     This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), (K), and (O). This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.

12.     Venue in this district is proper pursuant to 28 U.S.C. § 1409.

## PARTIES

13.     CGP and CGUSA are each California corporations and were incorporated in 1994 and 1991, respectively.

14.     Each of the Debtors filed a voluntary petition in this Court under Chapter 11 of Title 11 of the United States Code on December 14, 2016 (the "Petition Date").

15.     The Debtors continue to operate and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy. On December 15, 2016, the Court entered its order for the joint administration of the Debtors' bankruptcy cases (the "Bankruptcy Cases"). No trustee or official creditor committee has been appointed in the Bankruptcy Cases.

16.     Upon Information and belief, Defendant Nappi is a citizen of Italy and residing in Rome, Italy. Nappi took actions in the United States with regard to the Debtors

and the conduct alleged herein and also caused actions to be taken in this country through telephonic and electronic communications received here.

17.     Upon information and belief, Defendant Israilovici is a citizen of Italy and residing in Rome, Italy.  Israilovici took actions in the United States with regard to the Debtors and the conduct alleged herein and also caused actions to be taken in this country through telephonic and electronic communications received here.

18.     Upon information and belief, at all times material hereto, Defendant Klagi Limited was an entity controlled by Israilovici and Nappi.  Klagi Limited took actions in the United States with regard to the Debtors and the conduct alleged herein.

### GENERAL ALLEGATIONS

**A.    History of the Debtors' Management**

19.     The Debtors were historically part of a corporate family of entities that were owned or controlled by Gori.  Gori controlled the operations and businesses of the Debtors until September 2016.

20.     Beginning at least as early as 2008 and continuing through at least mid-2015, Israilovici and Nappi possessed decision-making authority over the Debtors, pursuant to authority granted by Gori.  On multiple occasions, the Chief Executive Officer of the Debtors was informed by Israilovici, Nappi, and Gori that Israilovici and Nappi were authorized to make decisions on the Debtors' behalf.

21.     Shortly before the Petition Date, Andrew De Camara ("De Camara") was appointed Chief Executive Officer of the Debtors and, upon his appointment, became responsible for the management of the Debtors' assets and financial affairs.

22.     Immediately after his appointment, De Camara and Debtors' present counsel began an investigation of the actions of the Debtors' prior management, including the actions of Israilovici and Nappi.  Pursuant to this investigation, De Camara and counsel have reviewed the Debtors' books and records and obtained documents concerning various transfers involving the Debtors' assets.  Only recently have De Camara and Debtors' counsel gathered sufficient information to support the allegations herein.

**B.  Assignment of Payments Due CGUSA to Shiba Limited**

23.     On March 9, 2012, CGUSA entered into a Distribution Agreement with Daro, with respect to the distribution of rights in and to certain motion pictures as set forth therein (the "Distribution Agreement").  A copy of the Distribution Agreement is attached hereto as Exhibit A.

24.     Pursuant to the Distribution Agreement, CGUSA acknowledged receiving certain funds from Daro and Daro agreed to pay an additional $808,484.05 to CGUSA in connection with the agreement (the "Daro Balance").  The Daro Balance was to be paid to CGUSA in installments of approximately $269,494.68 and according to a schedule set forth in the Distribution Agreement.

25.     On March 12, 2012, CGUSA sent a letter to Daro (the "Daro Letter") stating that CGUSA intended to assign the Daro Balance to Shiba (the "Shiba Assignment") and providing information for an account at Barclays Bank PLC maintained by Shiba.  Also on March 12, 2012, Shiba sent the first of three invoices to CGUSA, which invoices together totaled the amount of the Daro Balance and provided information for the same Shiba account at Barclays Bank PLC as referenced in the Shiba Assignment (the "Shiba Invoices").  A copy of the Daro Letter is attached hereto as Exhibit B.  A copy of the Shiba Invoices is attached hereto as Exhibit C.

26.     No business relationship between either of the Debtors and Shiba is reflected in the Debtors' books and records.  The Debtors' books and records do not reflect any other transaction involving Shiba.

27.     On June 15, 2012, CGUSA and Daro executed an Acknowledgement and Agreement (the "Daro Acknowledgement") in which CGUSA acknowledged that Daro had made a payment of $269,494.69 to Shiba (the "Shiba Payment") in connection with the Distribution Agreement.  A copy of the Daro Acknowledgement is attached hereto as Exhibit D.

28.     The Shiba Assignment was executed without the Debtors receiving consideration in exchange for the assignment.

29. The Shiba Payment was made without the Debtors receiving consideration in exchange for the payment.

30. Shiba is a private company registered in Hong Kong. The following is among the information Shiba listed on its Incorporation Form, which it filed on October 7, 2010:

| Registered Office | 3/F., Jonsim Place, 228 Queen's Road East Wanchai, Hong Kong |
|---|---|
| Founder Member and Address | Sine Nomine Nominees Limited 3/F., Jonsim Place, 228 Queen's Road East Wanchai, Hong Kong |
| Corporate Secretary and Address | Aall & Zyleman Company Limited 3/F., Jonsim Place, 228 Queen's Road East, Wanchai, Hong Kong |
| First Director | Oliver Nepomuceno Corso Elvezia 4 6900 Lugano Switzerland |
| First Director | Luigi Paolo Fabio Mameli Corso Elvezia 4 6900 Lugano Switzerland |

31. Israilovici and Nappi possessed decision-making authority over the Debtors and controlled the expenditure of the Debtors' funds during the period in which each of the Distribution Agreement, the Daro Letter, and the Daro Acknowledgement were executed and the Shiba Payment was made.

32. Nappi orchestrated the establishment of the Shiba entity and bank account that was used for the transfers, and both he and Israilovici directed the transfers from the Debtors to be made to Shiba.

33. The transfers to Shiba were made for the benefit of Israilovici and Nappi.

**C.  Transfer of Funds from CGUSA through Pippin Management Limited to Klagi Limited**

34. On October 18, 2012, a wire transfer in the amount of $49,980.00 was made from a bank account maintained by CGUSA at City National Bank to an account at

Royal Bank of Canada (the "Pippin Account") maintained by Pippin. On November 19, 2012, a second wire transfer, in the amount of $4,550,000, was made from a CGUSA account at Chase Bank to the Pippin Account. Together, these two wire transfers totaled $4,599,980.00 (together, the "Pippin Transfers") and reflect the transfer away from the Debtors of monies it was entitled to as the result of a settlement of the Nunnari Litigation.

35. Israilovici and Nappi possessed decision-making authority over the Debtors and controlled the expenditure of the Debtors' funds at the time each of the Pippin Transfers occurred.

36. Israilovici and Nappi created and maintained (or directed the creation and maintenance of) the Pippin Account for their own benefit and used it after Daro objected to making transfers to Shiba.

37. No business relationship between either of the Debtors and Pippin is reflected in the Debtors' books and records. The Debtors' books and records do not reflect any other transaction involving Pippin or the Pippin Account aside from the Pippin Transfers.

38. No benefit or consideration flowed to CGUSA in connection with the Pippin Transfers. The Pippin Transfers were made for the benefit of Israilovici and Nappi.

39. Pippin was incorporated in British Columbia, Canada, on May 31, 2010 and dissolved voluntarily on September 27, 2013.

40. The Pippin Account was funded almost exclusively by the Pippin Transfers. Between October 2012 and August 2013, the majority of the funds in the Pippin Account were transferred to one or more accounts at Barclays Bank PLC maintained by Klagi Limited (such accounts, the "Klagi Accounts"). The funds were transferred from the Pippin Account to the Klagi Accounts in the following amounts and on the following dates (collectively, the "Barclays Transfers"):

| Date of Transfer | Amount of Transfer |
|---|---|
| 10/23/2012 | $50,000.00 |

| | |
|---|---|
| 11/28/2012 | $550,000.00 |
| 12/5/2012 | $750,000.00 |
| 12/11/2012 | $750,000.00 |
| 1/8/2013 | $750,000.00 |
| 1/21/2013 | $375,000.00 |
| 2/7/2013 | $750,000.00 |
| 3/8/2013 | $595,000.00 |
| 8/20/2013 | $7,530.94 |

41.     Altogether, the Barclays Transfers total approximately $4,600,000.00.
Israilovici and Nappi created and maintained (or directed the creation and maintenance of)
the Klagi Accounts for their own benefit.

42.     No business relationship between either of the Debtors and Klagi
Limited is reflected in the Debtors' books and records.  The Debtors' books and records do
not reflect any transactions involving Klagi Limited or the Klagi Accounts.

43.     No benefit or consideration flowed to CGUSA in connection with the
Barclays Transfers.

44.     Klagi Limited was a private company registered in Hong Kong.  The
information Klagi Limited listed on its Incorporation Form, which it filed on February 27,
2009, is essentially the same as that on Shiba's incorporation documents:

| | |
|---|---|
| Registered Office | 3/F., Jonsim Place, 228 Queen's Road East Wanchai, Hong Kong |
| Founder Member and Address | Sine Nomine Nominees Limited 3/F., Jonsim Place, 228 Queen's Road East Wanchai, Hong Kong |
| Corporate Secretary and Address | Aall & Zyleman Company Limited 3/F., Jonsim Place, 228 Queen's Road East, Wanchai, Hong Kong |
| First Director | Oliver Nepomuceno Corso Elvezia 4 6900 Lugano Switzerland |

| First Director | Luigi Paolo Fabio Mameli<br>Corso Elvezia 4<br>6900 Lugano Switzerland |
| --- | --- |

### D.    The Miami Condo Purchase

45.    In December 2012, a total of $1.2 million was transferred from the Klagi Accounts to Sun Trust Title, LLC, a Florida limited liability company (together, the "Sun Trust Transfers").  The Sun Trust Transfers consisted of a $10,000 transfer initiated on December 12, 2012 and a $1.19 million transfer initiated on December 28, 2012.

46.    The Sun Trust Transfers were made in connection with the January 2013 purchase of condominium unit No. 2403 of the Bentley Bay Condominiums, located at 520 West Avenue, Miami Beach, Florida, 33139 ("Bentley Bay Condo 2403") in the name of ISNA, LLC ("ISNA").

47.    ISNA's purchase of Bentley Bay Condo 2403 is recorded in that certain Warranty Deed dated January 21, 2013 and recorded in the official records of Miami-Dade County, Florida on January 24, 2013 in Book 28458, page 4745.  A copy of the Warranty Deed is attached hereto as Exhibit E.

48.    ISNA's Operating Agreement, dated December 14, 2012, identifies Israilovici and Nappi as the company's only members, with each holding a fifty percent membership interest.  A copy of ISNA's Operating Agreement is attached hereto as Exhibit F.

49.    On January 11, 2013, The Bentley Bay Condominium Association sent Israilovici notice of its approval of the sale of Bentley Bay Condo 2403, which notice was recorded in the official records of Miami-Dade County, Florida, on February 5, 2013 in Book 28474, Page 659 (the "Sale Notice").  A copy of the Sale Notice is attached hereto as Exhibit G.

50.    Public records maintained by the Secretary of State of the State of Florida identify Israilovici as a manager of ISNA.

## FIRST CLAIM FOR RELIEF

### (Conversion, Against Israilovici and Nappi)

51.    Plaintiffs repeat and reallege each of the allegations in paragraphs 1 through 50 as set forth above.

52.    At all times mentioned herein, CGUSA was and still is entitled to the property subject to the Shiba Assignment and the Shiba Payment.

53.    At all times mentioned herein, CGUSA was and still is entitled to the property subject to the Pippin Transfers and the Barclays Transfers.

54.    Between March and June 2012, by way of the Shiba Assignment and the Shiba Payment, Israilovici and Nappi intentionally caused the property subject to such assignment and payment to be converted from CGUSA's possession and ownership for their own benefit.

55.    Between October and November 2012, by way of the Pippin Transfers and the Barclays Transfers, Israilovici and Nappi intentionally caused the property subject to such transfers to be converted from CGUSA's possession and ownership for their own benefit.

56.    As a direct and proximate result of Israilovici and Nappi's conversion of the Debtors' property, the Debtors have sustained and will sustain general, special, and consequential damages in an amount to be proven at trial.

57.    Israilovici and Nappi's schemes and conduct described herein, which deprived the Debtors of millions of dollars of their assets for Israilovici and Nappi's personal benefit using foreign entities with opaque ownership and other techniques common in money laundering schemes, were fraudulent, malicious, and oppressive toward the Debtors.  Accordingly, the Debtors are entitled to an award of punitive damages against Israilovici and Nappi, and each of them, sufficient to punish and deter Israilovici and Nappi.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty, Against Israilovici and Nappi)

58.     Plaintiffs repeat and reallege each of the allegations in paragraphs 1 through 50 as set forth above.

59.     Israilovici and Nappi owed Plaintiffs fiduciary duties, including a duty to exercise due care and diligence in the management and administration of the affairs of the Debtors and in the use and preservation of their property and assets; the duty of loyalty to put the interests of the Debtors above their own financial interests; and the duty of candor, including full and candid disclosure of all material facts related thereto.

60.     To discharge these duties, both Israilovici and Nappi were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Debtors.  By virtue of this obligation of ordinary care and diligence, both Israilovici and Nappi were required, among other things, to:

a.     manage, conduct, supervise, and direct the employees, businesses and affairs of the Debtors in accordance with laws, rules and regulations, and the charter and bylaws of the Debtors, so as to avoid damage to the Debtors' interests;

b.     neither violate nor knowingly or recklessly permit any officer, director or employee of the Debtors to violate applicable laws, rules and regulations, and to exercise reasonable control and supervision over such officers and employees; and to ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by the Debtors; and

c.     not transfer or agree to transfer the assets of the Debtors for insufficient or no consideration.

61.     By reason of the conduct alleged herein, both Israilovici and Nappi violated their fiduciary duties to the Debtors of care, loyalty, reasonable inquiry, oversight, good faith and proper supervision. Israilovici and Nappi's misconduct involves knowing violations of their duties as director, officer, managing agent, and/or counsel of the

Debtors, and the absence of good faith on their part, of which Israilovici and Nappi were aware or should have been aware, posed a risk of serious injury to the Debtors.

62.     As a direct and proximate result of the conduct of Israilovici and Nappi, the Debtors have sustained and will sustain general, special, and consequential damages in an amount to be proven at trial.

63.     Israilovici and Nappi's schemes and conduct described herein, which deprived the Debtors of millions of dollars of their assets for Israilovici and Nappi's personal benefit using foreign entities with opaque ownership and other techniques common in money laundering schemes, were fraudulent, malicious, and oppressive toward the Debtors.  Accordingly, the Debtors are entitled to an award of punitive damages against Israilovici and Nappi, and each of them, sufficient to punish and deter Israilovici and Nappi.

## THIRD CLAIM FOR RELIEF

### (Treble Damages Pursuant to California Penal Code §§ 496 (a) and (c), Against Israilovici and Nappi)

64.     Plaintiffs repeat and reallege each of the allegations in paragraphs 1 through 50 as set forth above.

65.     Israilovici and Nappi received the property that was stolen from plaintiffs through the Shiba Assignment, the Shiba Payment, and the Pippin Transfers, withheld such property from the plaintiffs, and/or aided in the withholding of such property.

66.     At the time that Israilovici and Nappi received, withheld, and/or aided in the withholding of such property, they knew that the property actually belonged to Plaintiffs.

67.     Plaintiffs are entitled to treble damages in an amount to be proved at trial pursuant to Calif. Penal code §§ 496 (a) and (c).

<u>**FOURTH CLAIM FOR RELIEF**</u>

**(For Avoidance and Recovery of Intentional Fraudulent Transfer Pursuant to Cal. Civ. Code §§ 3439.04(a)(1), 3439.07(a)(1) and 3439.08(b)(1), Against Israilovici, Nappi, and Klagi Limited)**

68.     Plaintiffs repeat and reallege each of the allegations in paragraphs 1 through 50 as set forth above.

69.     The Shiba Assignment, the Shiba Payment, and the Pippin Transfers each constitute a transfer of interests in property of the Debtor as defined under section 3439.01 of the California Civil Code.

70.     Israilovici and Nappi controlled the Debtors' affairs and the expenditure of the Debtors' funds until shortly before the Petition Date.  Plaintiffs were only able to investigate and bring this claim after the installation of De Camara as their Chief Executive Officer.  This claim is alleged within two years of such date.

71.     CGUSA entered into the Shiba Assignment and made the Shiba Payment and the Pippin Transfers at Israilovici and Nappi's behest with actual intent to hinder, delay or defraud creditors.

72.     All of the circumstances surrounding the Shiba Assignment, the Shiba Payment, and the Pippin Transfers show numerous badges of fraud.  For example only, but not limited to the facts that:

a.     The Shiba Assignment and the Shiba Payment were made to Shiba, an opaque, foreign-registered entity;

b.     CGUSA received no consideration for the Shiba Assignment or the Shiba Payment;

c.     The Shiba Assignment and the Shiba Payment constituted a substantial amount of CGUSA's assets;

          d.     The Pippin Transfers were made to Pippin, an opaque, foreign-registered entity;

          e.     CGUSA received no consideration for the Pippin Transfers;

          f.     Israilovici and Nappi have denied knowledge of Pippin despite an email exchange between them dated June 15, 2012 in which Nappi explicitly references a "Pippin".

          g.     The Pippin Transfers constituted a substantial amount of CGUSA's assets;

73.     Subsequent to the Pippin Transfers, Pippin transferred to the Klagi Accounts an amount nearly identical to the Pippin Transfers. Funds from the Klagi Accounts were thereafter used to purchase a condo in the name of ISNA, an entity owned by Israilovici and Nappi and managed by Israilovici.

74.     By reason of the foregoing, the Shiba Assignment, the Shiba Payment, and the Pippin Transfers are each subject to avoidance and recovery under California Civil Code sections 3439.04.

75.     Further, under California Civil Code section 3439.08(b)(1), the Debtors are entitled to recover from Defendants either the assets transferred pursuant to the Shiba Assignment, the Shiba Payment, and the Pippin Transfers, or the value of such assets, plus interest thereon as allowed by law.

76.     Defendants' schemes and conduct described herein, which deprived the Debtors of millions of dollars of their assets for Israilovici and Nappi's personal benefit using foreign entities with opaque ownership and other techniques common in money laundering schemes, were fraudulent, malicious, and oppressive toward the Debtors. Accordingly, the Debtors are entitled to an award of punitive damages against Defendants, and each of them, sufficient to punish and deter Defendants.

## FIFTH CLAIM FOR RELIEF

**(For Avoidance and Recovery of Constructive Fraudulent Transfer Pursuant to Cal. Civ. Code §§ 3439.04(a)(2), 3439.07(a)(1) and 3439.08(b)(1), Against Israilovici, Nappi, and Klagi Limited)**

77.     Plaintiffs repeat and reallege each of the allegations in paragraphs 1 through 50 as set forth above.

78.     The Shiba Assignment, the Shiba Payment, and the Pippin Transfers each constitute a transfer of interests in property of the Debtor as defined in Section 3439.01 of the California Civil Code.

79.     CGUSA did not receive consideration reasonably equivalent in value to the Shiba Assignment or the Shiba Payment.

80.     CGUSA did not receive consideration reasonably equivalent in value to the Pippin Transfers.

81.     At the time of the Shiba Assignment and the Shiba Payment, CGUSA was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

82.     At the time of the Pippin Transfers, CGUSA was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

83.     At the time of the Pippin Transfers, CGUSA intended to incur, and believed or reasonably should have believed that it would incur, debts beyond its ability to pay as the debts became due.

84.     CGUSA was insolvent or became insolvent as a result of the Shiba Assignment and the Shiba Payment.

85.     CGUSA was insolvent or became insolvent as a result of the Pippin Transfers.

86.     Israilovici and Nappi controlled the Debtors' affairs and the expenditure of the Debtors' funds until shortly before the Petition Date.  Plaintiffs were only able to investigate and bring this claim after De Camara became their Chief Executive Officer.  This claim is alleged within two years of such date.

87.     By reason of the foregoing, the Debtors are entitled to avoid the Shiba Assignment, the Shiba Payment, and the Pippin Transfers as constructive fraudulent transfers pursuant to California Civil Code sections 3439.04(a)(2) and 3439.07(a)(1).

88.     Under California Civil Code section 3439.08(b)(1), the Debtors are entitled to recover from Defendants the assets transferred pursuant to the Shiba Assignment, the Shiba Payment, and the Pippin Transfers, or the value thereof, plus interest thereon as allowed by law.

89.     Defendants' schemes and conduct described herein, which deprived the Debtors of millions of dollars of their assets for Israilovici and Nappi's personal benefit using foreign entities with opaque ownership and other techniques common in money laundering schemes, were fraudulent, malicious, and oppressive toward the Debtors. Accordingly, the Debtors are entitled to an award of punitive damages against Defendants, and each of them, sufficient to punish and deter Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, the Debtors respectfully request that the Court enter a judgment as follows:

1.     For avoidance and recovery of the Shiba Assignment;

2.     For avoidance and recovery of the Shiba Payment;

3.     For avoidance and recovery of the Pippin Transfers;

4.     For actual and compensatory damages according to proof;

5.     For punitive and exemplary damages for all claims for which such damages are authorized;

6.      For pre-judgment and post-judgment interest on the damages caused by Defendants;

7.      For reasonable attorney's fees and costs under applicable law; and

8.      For such other further relief as is just and proper.

DATED:  March 5, 2018

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By             */s/ Ori Katz*
                ORI KATZ
                STEVEN B. SACKS
                ROBERT K. SAHYAN

# EXHIBIT A

#7684

# DISTRIBUTION AGREEMENT

This Distribution Agreement ("**Agreement**") is made as of _9/March_ 2012, between Cecchi Gori USA, Inc., a California corporation ("**Licensor**") and Daro Film Distribution GmbH, a company formed under the laws of Switzerland ("**Distributor**"), with respect to the distribution rights in and to certain motion pictures, as set forth in Exhibit A (each, a "**Picture**" and, collectively, "**Pictures**"), owned and/or licensed by Licensor (the "**Film Library**"). The parties hereto hereby agree as follows:

1.      Conditions Precedent. Distributor shall have no obligation under this Agreement unless and until Distributor receives and approves chain-of-title and all other relevant underlying agreements (including, without limitation, necessary laboratory access letters, etc.) relating to production and distribution of the Film Library in the "Territory" (as defined below) as may be required by Distributor ("Conditions Precedent"). Notwithstanding the foregoing, Distributor hereby acknowledges prior receipt of all of the foregoing and satisfaction of the Conditions Precedent by Licensor.

2.      Distribution.

        a.      Licensor does hereby irrevocably and unconditionally grant, assign and license to Distributor, during the Term (as defined below), the exclusive rights to distribute, sub-distribute, exhibit, market, promote and exploit the Film Library in any and all manners throughout the World, excluding only the United States and Canada and each of their respective territories, possessions and military bases (the "**Territory**"), subject only to the territorial limitations otherwise set forth herein, and in all media now known or hereafter devised including, without limitation, theatrical, non theatrical, all forms of home video including, without limitation, cassettes/discs, cartridges, DVD, CVD, tapes or similar devices, and any other formats or delivery systems now known or hereafter devised (including, without limitation, so-called interactive formats [e.g. CD-I, CD-ROM, etc.]) which are intended primarily for home viewing and all forms of television including, without limitation, standard, non standard, subscription, pay television, cable and basic cable, satellite, pay-per-view, pay-per-channel, fiber optic and digital delivery systems; all forms of distribution by means internet or mobile distribution, all methods of video on demand (AVOD, SVOD, DTO, etc.) and/or electronic sell through, for display on any viewing device (e.g., LCD, plasma, handheld viewing devices, video display monitors, etc.) using computer or computer mediated processing units, airline and ship rights; all new and future media rights; literary publishing rights; soundtrack rights; music publishing rights and film clip rights. Distributor also has the right with respect to all persons appearing in the Pictures or performing production services therein to use, reproduce, transmit, broadcast, exploit, publicize and exhibit their names and likenesses in transcriptions, advertising, distribution and exploitation of the Pictures. Notwithstanding the foregoing, the rights granted with respect to each title shall be limited in term and territory only to the extent set forth on Exhibit A attached hereto and incorporated by this reference.

        b.      The term of this Agreement (the "**Term**") shall continue in perpetuity. Notwithstanding the foregoing, for each individual Picture in the Film Library, the Distributor Rights shall expire on the date listed for that particular Picture in Exhibit A; and the lengths of license terms which Distributor may grant in connection with Distributor's exploitation of the Distributor Rights shall be limited as set forth on Exhibit A.

        c.      The rights granted by Licensor to Distributor in this Paragraph shall be referred to herein as the "**Distributor Rights**."

3.      Advance Payment to Licensor:

        a.      Advance: Licensor agrees to deliver the Film Library to Distributor free and clear of any claims, liens or encumbrances (excluding only customary security interests granted to applicable guilds [if any], and the security interest granted to Distributor pursuant to this Agreement [the "**Permitted Encumbrances**"]). Distributor agrees to pay Licensor (provided, that Licensor is not in uncured breach



or uncured default of any of its representations, warranties, covenants or agreements hereunder and subject to the terms, conditions and provisions hereof) and Licensor agrees to accept as full consideration for the Distributor Rights granted by Licensor herein an amount ("**Advance**") equal to Two Million, One Hundred Thirty-Two Thousand Six Hundred Fifty-Nine Dollars and Five Cents ($2,132,659.05), and acknowledges prior receipt of One Million, Three Hundred Twenty-Four Thousand, One Hundred Seventy-Five Dollars ($1,324,175). As such, the remainder of the Advance, Eight Hundred Eight Thousand, Four Hundred Eighty Four Dollars and Five Cents ($808,484.05), shall be paid to Licensor as follows:

        i.     A payment equal to Two Hundred Sixty-Nine Thousand, Four Hundred Ninety-Four Dollars and Sixty-Nine Cents ($269,494.69), payable upon execution of this Agreement.

        ii.     A payment equal to Two Hundred Sixty-Nine Thousand, Four Hundred Ninety-Four Dollars and Sixty-Eight Cents ($269,494.68), payable on or before April 1, 2012.

        iii.     A payment equal to Two Hundred Sixty-Nine Thousand, Four Hundred Ninety-Four Dollars and Sixty-Eight Cents ($269,494.68), payable on or before May 1, 2012.

4.     Licensor's Contingent Compensation.

     a.     Definition of "Gross Receipts": "**Gross Receipts**" means all monies actually received by and/or credited to Distributor from the exhibition, performance or exploitation of the Distributor Rights in the Pictures. Recoupable advances or security deposits shall not count as Gross Receipts until such time as they are earned or forfeited, except if any such advances or deposits are non-returnable or non-refundable, in which case they shall be included in Gross Receipts as and when they are received by or credited to Distributor.

     b.     Net Receipts: "Net Receipts" shall be defined as Gross Receipts less the following deductions:

        i.     Any amounts collected and paid by Distributor as taxes or for payment of taxes, such as admission, sales and value-added taxes; and,

        ii.     All actual third party out-of-pocket distribution costs paid or incurred by Distributor or its affiliates in commercially exploiting the Pictures including, without limitation, so-called "off the tops", print and advertising costs, delivery costs paid or incurred by Distributor (including, without limitation, creating any Delivery item not delivered by Licensor), subtitling and dubbing costs, sales and marketing costs, development and manufacturing costs), and all other customary distribution costs (the costs referenced in this subparagraph shall be referred to herein as "**Distribution Costs**").

     c.     Licensor Participation. Net Receipts shall be allocated as follows: (A) first, to Distributor until the amount of Net Receipts received by Distributor is equal to Ten Million Dollars ($10,000,000); thereafter, (b) fifty percent (50%) to Distributor and fifty percent (50%) to Licensor (such amount payable to owner shall be referred to herein as the "**Licensor Participation**").

     d.     Cross-collateralization. All Net Receipts from all Pictures and all countries in the Territory shall be fully cross-collateralized.

     e.     Foreign Funds. With respect to any Net Receipts received by Distributor in a currency other than United States Dollars, Distributor shall translate the Licensor Participation of any such funds to United States currency prior to reporting the same to Licensor. The translation rate with respect to any such funds shall be the rate of exchange prevailing and reasonably available to Distributor at the time Distributor actually translates such funds into United States currency, and Distributor shall have no

928464.2

2

*LA 130,162,267v3*

obligation to translate any such funds to United States currency at any time prior to the time Distributor is required to remit such funds (if any) to Licensor hereunder so as to maximize the benefit of a favorable rate of exchange. Amounts which would otherwise be included in Net Receipts but which are paid in foreign currency shall not be accounted for in Net Receipts until they are converted into United States Dollars. Any such payments in foreign currency that cannot lawfully be exported from the country or territory involved shall not be accounted for in Net Receipts unless and until they are used by Distributor in the territory in which it is held, in which event the United States Dollar equivalent thereof shall be included in Net Receipts.

       f.     Accounting Statements. Distributor shall render accounting statements to Licensor with respect to the Pictures no later than ninety (90) days after the close of each annual period during the Term, during which Distributor generates any Licensor Participation with respect to the Pictures. To the extent that any accounting statement shows that the Pictures have generated any Licensor Participation, Distributor shall pay the Licensor Participation to Licensor together with the accounting statement.

       g.     Existing Agreements. Licensor hereby irrevocably and unconditionally assigns to Distributor the exclusive right to collect and keep for its own account any monies due and owing, or that may become due and owing in the future, from the distribution of the Pictures in the Territory pursuant to any agreements currently in place in connection therewith. Any monies collected in association with this provision shall be included in Gross Receipts.

5.     Guild Residuals / Third Party Payments. The parties agree that Licensor shall be completely responsible for making all applicable guild residual payments ("**Residuals**") and/or any other third party payments (including, by way of example but not limitation, profit participations, deferments, etc.) for the Pictures, if any, with respect to the Territory during the Term, and Distributor shall have no obligation whatsoever to pay any Residuals or third party payments.

6.     Delivery: Licensor agrees to deliver to Distributor all elements related to the Pictures as requested by Distributor to allow for first class distribution of the Pictures including, without limitation, HD capability. The Pictures shall not be subject to any liens except the Permitted Encumbrances. Notwithstanding the foregoing, Distributor acknowledges receipt of all of the foregoing and that all delivery requirements hereunder have been fully satisfied by Licensor.

7.     Foreign Preparation. Licensor acknowledges that to distribute foreign versions may require Distributor to change the title of a Picture, dub or subtitle a Picture and/or change, add material to, delete material from or edit a Picture in order to conform with timing or censorship requirements and, therefore, would require that Distributor have access to certain material including, without limitation, all film and video elements with respect to that Picture. Licensor agrees to use its good faith reasonable efforts to cooperate with Distributor in the course of its foreign preparation including, without limitation, affording Distributor prompt access to and duplication of the aforesaid materials as requested by Distributor. Distributor may create or cause to be created or manufactured the dubbed version of the Pictures to the extent that the language versions needed by Distributor are not otherwise available to Licensor to deliver to Distributor, and any costs associated with such preparation shall be Distribution Costs.

8.     Distribution Control. Distributor shall have, subject to the terms of this Agreement, complete, exclusive and unqualified discretion and control as to the time, manner and terms of distribution, exhibition and exploitation of each Picture and the Film Library, separately or in connection with other motion pictures, in accordance with such policies, terms and conditions and through such parties as Distributor in its sole business judgment may determine proper or expedient and the decision of Distributor in all such matters shall be binding and conclusive upon Licensor. Distributor makes no express or implied representation or warranty as to the manner or extent of any distribution or exploitation of the Pictures nor as to any maximum or minimum amount of monies to be expended in connection

928464.2

3

LA 130,162,267v3

therewith. Distributor does not guarantee the performance by any subdistributor, licensee or exhibitor of any contract regarding the distribution and exploitation of the Pictures.

9.    Representations and Warranties.

a.    Licensor represents, warrants and covenants to Distributor that:

i.    Licensor is an entity in good standing duly qualified to transact business in all places where such qualification is required or in which the failure to so qualify could have a material adverse effect on Licensor's business or Licensor's ability to perform its obligations under this Agreement. The party signing this Agreement on behalf of Licensor has full authority to enter into this Agreement on behalf of Licensor.

ii.    Licensor controls, and will have the right to grant to or vest in Distributor, the Distributor Rights with respect to the Pictures and the Film Library.

iii.    All of the following will have been paid or discharged prior to delivery of the Pictures, or will otherwise be paid or discharged when due:

(A)    all contractual amounts due and owing by Licensor to owners of copyrights in literary, dramatic or musical rights (except for public performance royalties which may be due) and other property or rights in or to all stories, plays, scripts, scenarios, themes, incidents, plots, characters, dialogue, music (except for public performance royalties which may be due), words and other material of any nature whatsoever appearing, used or recorded in the Pictures;

(B)    all contractual or statutory amounts due and owing by Licensor to owners of inventions and patent rights with respect to the recording of any and all dialogue, music and other sound effects recorded in the Picture, and with respect to the use of all equipment, apparatus, appliances and other materials used in photographing, recording or manufacturing the Pictures;

(C)    all contractual and statutory amounts due and owing by Licensor with respect to the use, distribution, performance, exhibition and exploitation of such Pictures, and any music contained therein, throughout the Territory (except for royalties, supplemental market, deferment, contingent compensation and similar payments, which Licensor will promptly pay (or cause to be paid) when due);

(D)    all costs of producing and completing the Picture.

iv.    The main and end titles of the Pictures will contain all necessary and proper credits for the actors, directors, writers and all other persons appearing in or connected with the production of the Pictures who are entitled to receive credit in connection therewith.

v.    Except for the Permitted Encumbrances, there are not, and will not be, outstanding at any time during the Term with respect to the Pictures any liens, and, to the best of Licensor's knowledge, claims, charges, encumbrances, restrictions, agreements, commitments or arrangements whatsoever with any person or entity, or any obligation (past, present or future), or any breach of any contract, license or agreement, which will materially interfere with, impair, abrogate or adversely affect any rights granted to Distributor pursuant to this Agreement. There are not, and will not be, any payments of any kind required to be made by Distributor with respect to, or as a result of, any use of the Pictures pursuant to the rights and licenses granted to Distributor hereunder.

vi.    Neither the Pictures, nor any part thereof, nor any materials contained therein or synchronized therewith, nor the titles thereof, nor the exercise of any right, license or privilege granted

928464.2

4

*LA 130,162,267v3*

herein, will violate or infringe any trademark, trade name, contract, agreement, copyright (whether common law or statutory), patent, literary, artistic, dramatic, personal, private, civil, property or privacy right or "moral rights of authors" or any other right of, nor will it slander or libel, any person or entity.

        vii.     Licensor has not sold, assigned, transferred or conveyed or taken any action and will not sell, assign, transfer or convey or take any action, to any party, any right, title or interest in or to the Pictures or any part thereof, or in or to the dramatic or literary material upon which the Pictures are based, which sale, assignment, transfer, conveyance or action would be adverse to or in any way impair the rights granted to Distributor hereunder.

        viii.    Licensor has not entered into any agreement with any contractual restrictions which would prevent Distributor from exploiting the Distributor Rights, and there are not, and will not be, any payments (out of any part of any revenues from the distribution or exploitation of the Pictures or otherwise) which must be made by Distributor to any actors, musicians, directors, writers or other persons who participated in the Picture, or to any union, guild or other labor organization for any right to exhibit the Pictures or as compensation in connection with such exhibition or for any other use of the Pictures or any of the rights granted hereunder. Any and all such payments shall be the sole responsibility of, and shall be made by, Licensor.

        ix.     All photos, stills, transparencies and other photos and/or likenesses delivered to Distributor will have been approved by any party who has the right to approve such material.

        b.     Distributor represents, warrants and covenants to Licensor that:

        i.     Distributor has full authority and ability to enter into and completely perform this Agreement.

        ii.     There are no existing or, to the best of Distributor's knowledge, threatened claims or litigation which would adversely affect or impair Distributor's ability to completely perform under this Agreement.

        c.     Indemnities.

        i.     Licensor agrees to defend, indemnify and hold Distributor, its successors, assigns, licensees, parents, affiliates, officers, directors and employees harmless from any and all claims, actions or proceedings of any kind and from any and all damages, liabilities, costs and expenses (including reasonable outside attorneys' fees and costs) relating to or arising: (i) out of any breach of any of the warranties, representations and/or agreements made by Licensor contained in this Agreement; (ii) out of any claim alleging facts which if true would constitute a material breach of this Agreement by Licensor; and/or (iii) in connection with Licensor's failure to make any third party payments, including, without limitation, payments to guilds and/or unions of residuals and/or third party participations, arising out of Distributor's exploitation of the Distributor Rights.

        ii.     Distributor agrees to defend, indemnify and hold Licensor harmless from any and all claims, actions or proceedings of any kind and from any and all damages, liabilities, costs and expenses (including reasonable outside attorney's fees and costs) relating to or arising: (i) out of any breach of any of the warranties, representations and/or agreements made by Distributor contained in this Agreement; and/or (ii) out of any claim alleging facts which if true would constitute a material breach of this Agreement by Distributor.

10.    Security Interest/Copyright Mortgage.  Licensor shall execute and deliver to Distributor a Security Agreement & Mortgage of Rights Including Copyright (the "**Distributor Security Agreement**"). Licensor hereby grants and assigns to Distributor, subject to the Permitted Encumbrances,

928464.2

5

*LA 130,162,267v3*



a continuing lien and security interest in and to and copyright mortgage in and to Distributor's distribution rights in the Pictures hereunder and all products and proceeds and revenues derived from the exploitation of the Pictures in the Territory. Licensor shall execute and deliver to Distributor any and all documents and to such acts and deeds as may be reasonably required by Distributor or its assignees or licensees to further perfect, protect or evidence the Distributor security interest and lien. In the event Licensor fails to do so within five (5) business days after Distributor's request therefor, Distributor may execute such documents as Licensor's appointed attorney-in-fact, which appointment for such purposes is hereby made irrevocable and coupled with an interest. The executing party shall promptly furnish the other party with copies of documents executed pursuant to said power.

11.     Errors and Omissions Insurance. Licensor shall obtain and maintain Errors and Omissions Insurance, and any other policy necessary to insure the distribution of the Film Library contemplated hereunder, in a customary form and in customary amounts from a qualified insurance company reasonably acceptable to Distributor naming Distributor, its successors, assigns, licensees, parent, officers, directors and employees as a named insured. As proof of such insurance, a fully paid certificate of insurance naming Distributor, its successors, assigns, licensees, parent, officers, directors and employees as a named insured will be submitted to Distributor within five (5) days of executing this Agreement.

12.     Withholding Tax. Distributor may be obliged to withhold taxes, as provided by law, from the monies payable to Licensor hereunder and to pay such taxes to the appropriate governmental authority. The amount of the applicable withholding tax shall be determined by applicable law.

13.     No Equitable Relief. Licensor's sole remedy for a breach by Licensee of its obligations under this Agreement shall be an action at law for damages and Licensor acknowledges that such damages are fully adequate to compensate Licensor in the case of any breach by Licensee hereunder. In no other event shall Licensor seek or be entitled to rescission, injunctive or other equitable relief.

14.     Attorneys' Fees. If any party to this Agreement commences an action against another party to this Agreement to interpret or enforce any of the terms of this Agreement, or because of the other party's breach of any provision set forth in this Agreement, the losing party shall pay the prevailing party's reasonable outside attorneys' fees, costs and expenses, court costs and other costs of action incurred in connection with the prosecution or defense of such action, whether or not the action is prosecuted to a final judgment. In addition to the foregoing award of attorneys' fees, the prevailing party shall be entitled to its reasonable outside attorneys' fees incurred in any post judgment proceeding to enforce any judgment in connection with this Agreement. This paragraph is separate and several and shall survive the merger of this paragraph into any judgment.

15.     No Third Party Beneficiaries. This Agreement is not made and shall not inure to the benefit of any person not a party hereto and shall not be deemed to give any right or remedy to any third party (including any audit rights).

16.     Governing Law. This Agreement shall be governed by the laws of the State of California applicable to agreements executed and to be wholly performed therein.

17.     Dispute Resolution. The parties to this Agreement agree that all actions or proceedings arising directly or indirectly from this Agreement shall be arbitrated or litigated before arbitrators or in courts having a situs within Los Angeles County, California, and hereby consent to the jurisdiction of any local, state or federal court in which such an action is commenced that is located in Los Angeles County, California, and agree not to disturb such choice of forum.

928464.2

6

*LA 130,162,267v3*

18.     Assignment.

        a.      Distributor.  Distributor may assign or transfer any of its rights hereunder (i) to a financially responsible company which acquires all or substantially all of Distributor's assets; (ii) to any affiliated company; (iii) as otherwise permitted hereunder or (iv) in connection with an assignment or grant of a security interest to a bank or other lender as security for a loan to Distributor; provided, however that Distributor shall remain secondarily liable hereunder.  Nothing in this Paragraph shall be deemed to prohibit Distributor from exploiting any of the Distributor Rights through a licensee or sub-distributor.

        b.      Licensor.  Licensor may assign or transfer any of its rights hereunder (i) to a financially responsible company which acquires all or substantially all of Licensor's assets, (ii) to any affiliated company; (iii) as otherwise permitted hereunder or (iv) in connection with an assignment or grant of a security interest to a bank or other lender as security for a loan to Licensor; provided, however that Licensor shall remain primarily liable hereunder.

19.     Confidentiality.  Distributor and Licensor mutually agree that the terms of this Agreement are confidential and shall not, without the prior written consent of the applicable party, be disclosed to any unauthorized person(s), firm(s), corporation(s) or other entity, all of whom shall be informed of the confidential nature of this Agreement and, except as may be required by court order, decree, statute or in connection with the filing or pleading in any litigation, shall agree to be bound by the terms and conditions of this Agreement including, without limitation, this Paragraph.

20.     Right to Cure.  No non-recurring act or omission of any party shall constitute an event of default or breach by such party of this Agreement unless the non-breaching party shall first notify the party in writing setting forth such alleged breach or default and such party shall not cure the same within thirty (30) days after receipt of such notice; provided, however, that any intentional breach of a material obligation of this Agreement which is not capable of cure shall not require the foregoing notice and cure period prior to constituting an event of default or breach under this Agreement.  This Paragraph shall not apply to Delivery of the Picture as set forth above.

21.     Force Majeure.  As used herein, an Event of Force Majeure shall include any accident, fire, explosion, casualty, epidemic, act of God, earthquake, floor, strike, walkout, picketing, labor controversy, civil disturbance, embargo, riot, terrorist, act, act of public enemy, war or armed conflict (whether or not there has been an official declaration of war), unavailability of essential materials and supplies, equipment, transportation, power or other commodity, failure or delay of any transportation agency, laboratory or any other furnisher of essential supplies, equipment or other facilities, enactment of any law, any judicial or executive order or decree, the action of any legally constituted authority, or other event or cause of the nature of force majeure beyond the parties' control, whether similar or dissimilar to any of the foregoing, which causes an interruption or suspension of, or materially hampers, interferes with or delays, the regular business activities of Licensor, Distributor and/or sub-distributors, as the case may be.

22.     Notices.  All notices, payments, accountings and other data which Distributor is required or may desire to send or deliver to serve upon Licensor shall be delivered in person, by express mail, by certified mail, by overnight delivery, or by facsimile, addressed to Licensor at:

                    Cecchi Gori USA, Inc.
                    Bob Hope Building
                    5555 Melrose Avenue, Suite 203
                    Los Angeles, California 90038
                    Attention: Niels Juul
                    Email: niels.juul@cgglobalmedia.com

928464.2

7

LA 130,162,267v3

With a copy to:    Michael Wolf, Esq.
                   Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
                   11400 W. Olympic Boulevard, 9th Floor
                   Los Angeles, California 90064-1557
                   Email: mwolf@wrslawyers.com

or at such other address or addresses as Licensor may designate from time to time in writing.

All notices, payments, accountings, and other data which Licensor is required or may desire to send or deliver to or serve upon Distributor shall be delivered in person, by express mail, by certified mail, by overnight delivery, or by facsimile, addressed to Distributor at:

                   Daro Film Distribution GmbH
                   Le Patio Palace, 5th Floor
                   41 Avenue Hector Otto
                   Monaco, MC 98000
                   Attention: Pierre-Andre Rochat
                   Email: Acquisition@daro-films.mc

With a copy to:    Greenberg Traurig, LLP
                   1840 Century Park East, 19th Floor
                   Los Angeles, California 90067
                   Attention: David Markman, Esq.
                   Email: markmand@gtlaw.com

The date of personal delivery, mailing, or delivery of such notice shall be deemed the date of service of such notice or payment, unless otherwise specified herein; provided, that any notice which commences the running of any period of time for the exercise of any option or the performance of any other act shall be deemed served when so delivered.

23.    Miscellaneous.

a.    Subject to Licensor's limitation on remedies set forth in Paragraph 15 hereof, the remedies accorded herein or otherwise available to either party shall be cumulative and no one such remedy shall be exclusive of any other. Without waiving any rights or remedies under this Agreement or otherwise either party may from time to time recover by action at law, any damages arising out of any breach of this Agreement by the other party and may institute and maintain subsequent actions for additional damages which may arise from the same or other breaches. The pursuit by Distributor of any remedy under this Agreement or otherwise shall not be deemed a waiver of any other or different remedy which may be available under this Agreement or otherwise, either at law or in equity.

b.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. Signatures via facsimile or PDF shall have the same force and effect as "ink" original signatures.

c.    A waiver by either party of any of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof. No amendment, supplement or modification of this Agreement shall be effective of binding unless in writing executed by the respective parties.

24.    Exhibits. Exhibits attached hereto are incorporated herein by this reference. In the event that the terms of this Agreement conflict with the terms of any exhibit attached hereto, the terms set forth in the Agreement will control.

928464.2

8

LA 130,162,267v3

## EXHIBIT "A"

## FILM LIBRARY

| Title | Expiration Date |
|---|---|
| A Bronx Tale | Perpetuity |
| Folks | Perpetuity |
| House of Cards | Perpetuity |
| Man Trouble | Perpetuity |
| 29th Street | March 27, 2027 |
| Amos & Andrew | February 9, 2018 |
| Honeymoon in Vegas | February 27, 2017 |
| Love Potion #9 | November 19, 2027 |
| Needful Things | August 6, 2018 |
| Night and the City | October 6, 2027 |
| North | June 15, 2019 |
| Shawshank Redemption | September 19, 2019 |
| Year of the Comet | April 21, 2017 |

928464.2

LA 130,162,267v3

**EXHIBIT B**



## Cecchi Gori USA, Inc.

**DARO FILM**
**Mr. Pierre André Rochat**
**"Le Patio Palace"**
**41, Avenue Hector Otto**
**98000 Monaco**

Los Angeles, 2012 March 12th

We hereby declare that we intend to assign to Company Shiba Limited, account

Barclay Bank PLC, London, UK
38 Hans Crescent, SW1XOLZ London, UK
IBAN          GB 88 BARC 2047 3575 8034 11
Account number 75803411 (USD)
SORT CODE    20-47-35
SWIFT – BIC   BARC GB22

The outstanding debt of $ 808,484.05 USD that your company owes to C.G. USA as of the distributions agreement previously signed by the parties (DARO FILM and C.G. USA).

The assigned Company Shiba Limited has already agreed about the terms of payment as follows:

$ 269,494.69 on March 12st
$ 269,494.68 on April 1st
$ 269,494.68 on May 4st

Best regards.

President of C.G. USA
Vittorio Cecchi Gori

11990 SAN VICENTE BOULEVARD, SUITE 200
LOS ANGELES, CALIFORNIA 90049
TELEPHONE: 310-442-4777  FAX: 310-442-9507

**EXHIBIT C**

# SHIBA LIMITED

**3rd Floor**
**Jonsim Place**
**228 Queen's Road East**
**Wanchai**
**Hong Kong**

Messrs.
**Cecchi Gori USA, Inc.**
11990 San Vicente Boulevard, Suite 200
Los Angeles, CA 90049
USA

Invoice no.: 20120312
Dated: March 12, 2012

## INVOICE

As per Distribution Agreement dated
9th March 2012 and subsequent
Assignment Letter of 12th March 2012

**We invoice you with......**

**USD 269,494.69**

Payment terms: at sight

In favour of our bank a/c no.: 75803411
With: BARCLAYS BANK PLC,
P.O. Box 391, 38 Hans Crescent
Knightsbridge, London SW1X 0LZ, UK
Branch Code: 20-47-35
Swift Code: BARCGB22

**SHIBA LIMITED**

Registration No. 1514595

# SHIBA LIMITED

**3rd Floor**
**Jonsim Place**
**228 Queen's Road East**
**Wanchai**
**Hong Kong**

Messrs.
**Cecchi Gori USA, Inc.**
11990 San Vicente Boulevard, Suite 200
Los Angeles, CA 90049
USA

Invoice no.: 20120401
Dated: April 1, 2012

## INVOICE

As per Distribution Agreement dated
9th March 2012 and subsequent
Assignment Letter of 12th March 2012

**We invoice you with......**                    **USD 269,494.68**

Payment terms:  at sight

In favour of our bank a/c no.:  75803411
With: BARCLAYS BANK PLC,
P.O. Box 391, 38 Hans Crescent
Knightsbridge, London SW1X 0LZ, UK
Branch Code: 20-47-35
Swift Code: BARCGB22

**SHIBA LIMITED**

# SHIBA LIMITED

3rd Floor
Jonsim Place
228 Queen's Road East
Wanchai
Hong Kong

Messrs.
**Cecchi Gori USA, Inc.**
11990 San Vicente Boulevard, Suite 200
Los Angeles, CA 90049
USA

Invoice no.: 20120504
Dated: May 4, 2012

## INVOICE

As per Distribution Agreement dated
9th March 2012 and subsequent
Assignment Letter of 12th March 2012

**We invoice you with......**                **USD 269,494.68**

Payment terms: at sight

In favour of our bank a/c no.: 75803411
With: BARCLAYS BANK PLC,
P.O. Box 391, 38 Hans Crescent
Knightsbridge, London SW1X 0LZ, UK
Branch Code: 20-47-35
Swift Code: BARCGB22

**SHIBA LIMITED**

Registration No. 151459G

# EXHIBIT D



Cecchi Gori Pictures • CG Global Media

June 15, 2012

Acknowledgment and Agreement.

I, Niels Juul in my capacity as CEO of Cecchi Gori USA, Inc. acknowledges that the first payment of 269,494.69 in connection with the Distribution Agreement dated as of March 9th 2012 (hereafter "the AGREEMENT") between Cecchi Gori USA, Inc. ("CGUSA") and Daro Film Distribution GmbH ("Daro, and collectively with CGUSA, "the PARTIES"), has been made Daro to a company affiliated with CGUSA, called Shiba Limited, as per the instructions received by Daro from Vittorio Cecchi Gori.

The PARTIES hereby further agree on the following:

CGUSA hereby acknowledges and accepts that the initial payment was made to Shiba Limited and satisfied the payment required by clause 3.a.i of the AGREEMENT.

In accordance with clauses 3.a.ii and 3.a.iii of the AGREEMENT, the remaining two payments of $269,494.68 were due on April 1, 2012, and May 1, 2012, respectively.

CGUSA hereby acknowledges that Daro made one payment to CGUSA of $269,464.69 on June 21, 2012, and that Daro shall make one final payment of $269,464.67 to CGUSA upon the full execution of this Acknowledgement and Agreement

The making of the final payment to CGUSA will conclude Daro's payment obligations in connection with The AGREEMENT.

As requested by Daro, CGUSA shall issue a full declaration of the Daro rights under The AGREEMENT to whomever Daro requires.

Except as expressly amended by this Acknowledgement and Agreement, all of the provisions of the AGREEMENT are hereby affirmed and shall continue in full force and effect, in accordance with their respective terms.

Cecchi Gori USA, Inc.

By: Niels Juul
Its; CEO        16/7 2012

Daro Film Distribution GMbh.

By: Pierre-André ROCHAT
Its: President

*La vita e bella*
www.cecchigoripictures.com • info@cgglobalmedia.com

LA 130358509v2 July 7, 2012

# **EXHIBIT E**

CFN: 20130063783 BOOK 28458 PAGE 4745
DATE:01/24/2013 08:25:25 PM
DEED DOC 6,900.00
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

Prepared by:
**Michael S. Tobin, Esq.**

**Rothman & Tobin, P.A.**
**11900 Biscayne Boulevard Suite 740**
**Miami, FL 33181**

File Number: **12-260**
Will Call No.:

Parcel Identification No. **02-4203-291-0550**

_____ [Space Above This Line For Recording Data] _____

# Warranty Deed

### (STATUTORY FORM - SECTION 689.02, F.S.)

**This Indenture** made this $\underline{21^{st}}$ day of **January, 2013** between **Christopher M. Savine, a married man** whose post office address is **6000 Island Boulevard, Unit 504, Aventura, FL 33160** of the County of **Miami-Dade**, State of **Florida**, grantor*, and **ISNA, LLC, a Florida limited liability company** whose post office address is $\underline{520\ West\ Ave\ \#2403\ Miami\ Beach,\ FL.\ 33139}$ of the County of $\underline{Miami-Dade}$, State of $\underline{FL.}$, grantee*,

**Witnesseth** that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in **Miami-Dade County, Florida**, to-wit:

> **Condominium Unit No. 2403, of THE BENTLEY BAY CONDOMINIUM, a Condominium, according to the Declaration thereof, as recorded in Official Records Book 23222, at Page 1234, of the Public Records of Miami-Dade County, Florida.**
>
> **This conveyance is subject to the following:**
> **1. Taxes and assessments for the year 2013 and subsequent years.**
> **2. Conditions, restrictions, reservations, limitations, agreements and easements of record, if any; but this provision shall not operate to reimpose the same.**
> **3. Zoning ordinances.**
> **4. Restrictions, conditions, covenants, liens, terms and limitations set forth in the Declaration of Condominium referenced above and all amendments and exhibits thereto.**
>
> **Grantor warrants that at the time of this conveyance, the subject property is not the Grantor's homestead within the meaning set forth in the constitution of the state of Florida, nor is it contiguous to or a part of homestead property. Grantor's residence and homestead address is: 6000 Island Boulevard, Unit 504, Aventura, Florida 33160.**

and said grantor does hereby fully warrant the title to said land, and will defend the same against lawful claims of all persons whomsoever.

* "Grantor" and "Grantee" are used for singular or plural, as context requires.

**In Witness Whereof**, grantor has hereunto set grantor's hand and seal the day and year first above written.

DoubleTime®

CFN: 20130063783 BOOK 28458 PAGE 4746

Signed, sealed and delivered in our presence:

_____          _____ (Seal)
Witness Name: _____           Christopher M. Savine

Witness Name: _MICHAEL S. TOBIN_

State of Florida
County of Miami-Dade

The foregoing instrument was acknowledged before me this 14th day of January, 2013 by Christopher M. Savine, who [_] is personally known or [X] has produced a driver's license as identification.

[Notary Seal]

MICHAEL S. TOBIN
Notary Public - State of Florida
My Comm. Expires Sep 27, 2014
Commission # EE 27070
Bonded Through National Notary Assn.

Notary Public

Printed Name: _____

My Commission Expires: _____

*Warranty Deed (Statutory Form)* - Page 2                                    **DoubleTime®**

**EXHIBIT F**

# OPERATING AGREEMENT

## OF

## ISNA, LLC, A FLORIDA LIMITED LIABILITY COMPANY

### DATED: DECEMBER 14, 2012

## INTRODUCTION

The undersigned are all of the Members of ISNA, LLC, a Limited Liability Company formed under the laws of the State of Florida. The undersigned hereby adopt the following Operating Agreement pursuant to the LLC laws of the State of Florida, and do hereby certify and agree as follows:

### ARTICLE I – NAME

1.1 Name of Business: The name of the Company is ISNA, LLC. The business of the Company may be conducted under such trade or fictitious names as the Managers may determine.

### ARTICLE II. – OFFICES AND REGISTERED AGENT

2.1 Principal Office: The principal office of the Company is located at 520 West Avenue, Unit 2403, Miami Beach, FL 33139. The Company may have other offices, inside or outside the State of Florida as the Managers may designate.

2.2 Registered Office: The registered office of the Company in the State of Florida is located at 100 N. Biscayne Boulevard, Suite 2106, Miami, FL 33132. The registered agent of the Company for service of process at that address is AFI.

### ARTICLE III. – BUSINESS PURPOSE

3.1 Business Purpose: The purpose of the Company is to engage in any lawful business that may be engaged in by a limited liability company organized under the LLC laws of the State of Florida.

### ARTICLE IV. – MEMBERS

4.1 Members: The names of each initial Member, their capital contributions, and percentage interests are as follows:

| Name | Capital Contribution | Membership Interest |
|------|---------------------|---------------------|
| 1. Gabriele Israilovici | $600,000.00 | 50% |
| 2. Giovanni Nappi | $600,000.00 | 50% |

Page 1 of 8

Initials: ____

4.2 Additional Members: Additional Members may be admitted upon the consent of all Members.

4.3 Withdrawing: A Member may withdraw from the Company upon six months written notice to each remaining Member.

## ARTICLE V. – MEMBERS' CAPITAL ACCOUNTS

5.1 Capital Accounts: The Company will maintain a separate capital account for each Member. Each Member's capital account will reflect the Member's capital contributions and increases for the Member's share of any net income or gain of the Company. Each Member's capital account will also reflect decreases for distributions made to the Member and the Member's share of any losses and deductions of the Company.

   a) Each Member's capital account will be increased by: 1) the amount of money or the fair market value of property contributed by the Member to the Company (net of any liabilities secured by such contributed property that the Company is considered to assume or take subject to), 2) the amount of any Company liabilities assumed by the Member, and 3) allocations to the Member of profit, income, or gain.

   b) Each Member's capital account will be decreased by: 1) the amount of money and the fair market value of property distributed to the Member by the Company (net of any liabilities secured by such contributed property that the Company is considered to assume or take subject to), and 2) allocations to the Member of losses, deductions, and expenses.

   c) In the event of a permitted sale or exchange of an interest in the Company, the capital account of the transferor will become the capital account of the transferee.

   d) The manner in which capital accounts are to be maintained pursuant to this Operating Agreement is intended to comply with the requirements of the Internal Revenue Code Sec. 704(b) and the regulations thereunder. It is the specific intent of the Members that all adjustments as may be required pursuant to Sec. 704(b), and any restrictions thereunder, be made, so as to cause the allocations prescribed hereunder to be respected for tax purposes.

5.2 Fiscal Year: The fiscal year of the Company will be a calendar year. The books and records of the Company will be maintained in accordance with generally accepted accounting principles and Sec. 704(b) of the Internal Revenue Code and the regulations thereunder.

## ARTICLE VI. – ALLOCATIONS AND DISTRIBUTIONS

6.1 Allocations and Distributions: All items of Company income, gain, loss, deduction, credit, or the like will be allocated among the Members in accordance with their respective percentage interests.

Initials: _____ / _____

6.2 Distributions of Cash or Assets: Distributions of cash or other assets may be made to the Members from time to time. All distributions will be made to the Members in accordance with their respective percentage interests.

## ARTICLE VII. – ASSIGNMENT OF MEMBERSHIP INTERESTS

7.1 Assignment of Membership Interests: A Member may assign his or her membership interest in the Company in whole or in part. The assignment of a membership interest does not in and of itself entitle the assignee to become a Member. The assignee is only entitled to receive, to the extent assigned, the distributions the assigning Member would otherwise be entitled to, and the assignee will only become an assignee of a membership interest and not a substitute Member.

7.2 Substitute Members: An assignee of a membership interest will be admitted as a substitute Member and will be entitled to all the rights and powers of the assignee only if the other Members unanimously consent. If admitted, the substitute Member has, to the extent assigned, all of the rights and powers, and is subject to all of the restrictions and liabilities of a Member.

## ARTICLE VIII. – VOTING; MEMBERS MEETINGS

8.1 Voting: Except to the extent provided to the contrary in this Operating Agreement, all Members will be entitled to vote on any matter submitted to a vote of the Members in accordance with their membership interests. Each one percent (1%) of member interest will give a member one vote ( For example, in the LLC has two members, Member A who owns 45% of the LLC's Membership Interests, and Member B who owns 55% of the LLC's Membership Interests. Member A would receive 45 votes while Member B would receive 55 votes).

a) Unless a greater vote is required by the LLC laws of the State of Florida, the Articles of Organization, or this Operating Agreement, the affirmative vote or consent on a matter will be required.

b) The consent of all Members will be required to approve the following: 1) the dissolution of the Company, 2) the merger of the Company, 3) the conversion of the Company, 4) the authorization or ratification of acts that would otherwise violate the duty of loyalty, 5) an amendment to the Articles of Organization, 6) the sale, exchange, lease, or transfer of all or substantially all of the assets of the Company other than in the ordinary course of business, 7) the compromise of an obligation to make a contribution, 8) the making of interim distributions, 9) the admission of a new Member, 10) the use of the Company's property to redeem an interest subject to a charging order, 11) an amendment to the Operating Agreement.

8.2 Annual Meetings of Members: An annual meeting of Members for the transaction of such business as may properly come before the meeting will be held at such a time and place as the Manager will determine.

8.3 Special Meetings of Members: Special meetings of Members for any proper purpose may be called at any time by the Managers or by the majority of the Members, or the holders of at least 60% of the interest of all Members.

8.4 Notice of Meetings: The Company will deliver notice stating the date, time, place, and purposes of any meeting to each Member entitled to vote at the meeting. Notice will be given not less than forty-five days (45) or more than ninety days (90) days before the date of that meeting.

Initials: _____

**8.5 Meeting Participation:** A Member may participate and vote at any meeting via telephone conference call or similar equipment.

**8.6 Unanimous Written Consent:** Any action required or permitted to be taken at an annual or special meeting of the Members may be taken without a meeting if consent in writing, setting forth the action so taken, is signed by all the Members entitled to vote at the meeting.

**8.7 Voting by Proxy:** A Member may appoint a proxy to vote or otherwise act for the Member by signing an appointment instrument either personally or by the Member's attorney-in-fact.

## ARTICLE IX – MANAGEMENT OF THE COMPANY

**9.1 Management:** The Company will be managed by Carlo Dipasquale and/or such individuals or entities in which **Gabriele Israllovici and Giovanni Nappi, or the future Members** designates as their attorney in fact, or Manager. The number of Managers may be increased or decreased by amendment to this Operating Agreement, but no decrease will have the effect of shortening the term of any Manager.

a) The initial Managers as of the date of this Operating Agreement dated December 14, 2012 will be: Carlo Dipasquale. The initial Manager (s) will hold office for the life of the LLC or until such time that manger is replaced by the Members, or resigns his/her post as manager.

b) Each Manager will receive $0.00 as compensation for serving as Manager.

c) Subject to the delegation of rights and powers provided for herein, the Managers will have the sole right to manage the business of the Company and will have all powers and rights necessary, appropriate, or advisable to effectuate and carry out the purposes and business of the Company. No Member, by reason of his or her status as such, will have any authority to act for or bind the Company.

d) The Managers may appoint a President, Vice President, Treasurer, or Secretary, or such other Officers as they may deem necessary or appropriate.

e) The Managers may appoint, employ, or otherwise contract with other persons or entities for the transaction of business of the Company or the performance of services for or on behalf of the Company as they may deem necessary or appropriate. The Managers may delegate to any Officer of the Company or to any other person or entity such authority to act on behalf of the Company as they may deem appropriate.

f) The Managers may open bank accounts and/or brokerage accounts, purchase marketable securities and real property.

g) Any Manager, Officer, or other person specifically authorized by the Managers, may execute any contract or other agreement or document on behalf of the Company, and may execute and file on behalf of the Company with the Secretary of State any document required or permitted to be filed under the LLC laws of the State of Florida.

Initials: ___

9.2 Vacancies: Manager vacancies will be filled by a vote of a majority of the remaining Managers, or if there are none, by a vote of a majority of interest of the Members.

9.3 Terms: Managers will serve until they resign, die, become incapacitate, or are removed. Managers may be removed with or without cause by a vote of a majority of interest of the Members.

9.4 Resignation: A Manager may resign at any time by giving notice to the remaining Managers.

## ARTICLE X. – VOTING; MANAGERS MEETINGS

10.1 Voting: Unless a greater vote is required by the LLC laws of the State of Florida, the Articles of Organization, or this Operating Agreement, the affirmative vote or consent of a majority of the Managers present at a meeting at which a quorum is present will be the act of the Managers.

10.2 Annual Meeting of Managers: Regular meetings of Managers may be held at such time and at such place as the Managers designate. Special meetings of Managers may be called at the request of any Manager.

10.3 Quorum: A majority of the number of Managers will constitute a quorum for the transaction of business at a meeting of Managers.

10.4 Unanimous Written Consent: Any action required or permitted to be taken at a meeting of the Managers may be taken without a meeting, if consents in writing, setting forth the action taken, are signed by all Managers entitled to vote at the meeting.

10.5 Meeting Participation: A Manager may participate and vote at any meeting via telephone conference call or similar equipment.

## ARTICLE XI. – STANDARD OF CONDUCT; INDEMNIFICATION

11.1 Conduct: A Manager owes the Company and its Members a duty of loyalty and a duty of care. The duty of loyalty is limited to 1) accounting to the Company and holding as trustee for it, and property, profit, or benefit derived by the Manager in the conduct or winding up of the Company's business, 2) refraining from dealing with the Company as or on behalf of a party having an interest adverse to the Company, and 3) refraining from competing with the Company. The duty of care is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. A Manager will discharge his or her duties consistently with the obligation of good faith and fair dealing.

11.2 Indemnification: Except as otherwise provided in this Article, the Company will indemnify any Manager and may indemnify any employee or agent of the Company who was or is a party, or is threatened to be made a party, to any action, suit, or proceeding, other than an action by or in the right of the Company, by reason of the fact that such person is or was a Manager, employee, or agent of the Company against expenses, including attorney's fees, judgments, penalties, fines, and amounts paid in settlement actually and reasonably incurred by such person in connection with the action, suit, or proceeding, if the person met the standard of conduct set for above in this Article.

Initials: _____

a) To the extent that a Manager, employee, or agent of the Company has been successful on the merits or otherwise in defense of an action, suit, or proceeding, such person will be indemnified against actual and reasonable expenses, including attorney's fees incurred by such person in connection with the action, suit, or proceeding, and any action, suit, or proceeding brought to enforce the mandatory indemnification provided herein. Any indemnification permitted under this Article, unless ordered by a court, will be made by the Company only as authorized in the specific case upon a determination that the indemnification is proper under the circumstances because the person to be indemnified has met the applicable standard of conduct. That determination will be made by a majority vote of the Managers who are not parties or threatened to be made parties to the action, suit, or proceeding.

b) No indemnification will be provided to any Manager, employee, or agent of the Company for or in connection with the receipt of a financial benefit to which such person is not entitled, voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act, or a knowing violation of law.

## ARTICLE XII. – DURATION, DISSOLUTION

**12.1 Duration:** The Company will continue in existence until dissolved pursuant to this Article or the LLC laws of the State of Florida.

**12.2. Dissolution:** The Company will be dissolved and have its affairs wound up and terminated upon the determination of all of the Members to dissolve the Company, or upon the occurrence of any other event causing a dissolution of the Company under the LLC laws of the State of Florida.

**12.3 Winding Up:** Upon dissolution, the Company will cease carrying on its business and affairs and will commence the winding up of the Company's business and affairs, and complete the winding up as soon as possible. Upon the winding up of the Company, the assets of the Company will be distributed first to creditors to the extent permitted by law in satisfaction of the Company's debts, liabilities, and obligations, and second to Members and former Members in satisfaction of liabilities for distributions and in accordance with their percentage interests.

## ARTICLE XIII. – MISCELLANEOUS PROVISIONS

**13.1 Entire Agreement:** This Operating Agreement embodies the entire agreement and understanding among the Members with respect to the subject matter within. This Operating Agreement supersedes any and all other agreements, either oral or written, among the Members with respect to the subject matter within.

**13.2 Severance:** Every provision of this Operating Agreement is intended to be severable. The invalidity or illegality of any particular provision of this Operating Agreement will not effect the other provisions, and this Operating Agreement will be construed as if such invalid or illegal provisions were omitted.

**13.3 Amendments and Revocations:** This Operating Agreement may be amended or revoked at any time by the written consent of all of the Members.

Initials: _____

13.4 State Law: This Operating Agreement will be governed by, construed, and enforced in accordance with the laws of the State of Florida.

THE UNDERSIGNED, being all of the Members of ISNA, LLC, evidence their adoption and ratification of the foregoing Operating Agreement of the LLC.

Dated: December 31, 2012

Gabriele Israilovici – Member/Manager

Giovanni Nappi - Member

The foregoing instrument was acknowledged before me this 31st day of December, 2012, by Gabriele Israilovici who is: ☐ Personally Known or ☐ Produced the Following Identification; _____

_____

(NOTARY SEAL) _____
(Signature of Notary Public-State of Florida)

_____
(Name of Notary Typed, Printed, or Stamped)

The foregoing instrument was acknowledged before me this 31st day of December, 2012, by Giovanni Nappi who is: ☐ Personally Known or ☐ Produced the Following Identification; _____

_____

(NOTARY SEAL) _____
(Signature of Notary Public-State of Florida)

Page 7 of 8

Initials: ___/___

ISNA_Operating_Agreement_12312012

_____

_____
(Name of Notary Typed, Printed, or Stamped)

Page 8 of 8

Initials: _____

**EXHIBIT G**



CFN: 20130092857 BOOK 28474 PAGE 659
DATE:02/05/2013 10:19:23 AM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

January 11, 2013

Gabriele Israilovici
520 West Avenue # 2403
Miami Beach, FL 33139

To Whom It May Concern:

The Sales Application for Unit # 2403 has been accepted by the Bentley Bay
Condominium Association, Inc. Board of Directors. Association's approval is
conditioned upon payment in full of all sums owed to the Association related to the
unit as of the date of the closing. Any such payment will be made on or before the
date of closing.

Thank you and welcome to The Bentley Bay.

The Bentley Bay Condominium Assoc., Inc.

By: _____
                       Janne Keskinen, as President

STATE FO FLORIDA        )

COUNTY OF MIAMI-DADE )

     The foregoing instrument was acknowledged before me on this 11 day of
January, 2013, by Janne Kaskinen as President .
He/she/they is/are personally known to me and/or has/have produced Florida
Drivers License number_____ .
as identification.

                                         
                       Notary Public – State of Florida
                       Print Name: STEVE G. MASON
                       My Commission expires:

STEVE G. MASON
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE177282
Expires 3/7/2016

The Bentley Bay Condominium Association Inc. 540 West Ave Miami FL 33139 Ph: 305-604-8655 Fax: 305-604-8660

# EXHIBIT B

SUPERIOR COURT FOR THE STATE OF CALIFORNIA.

COUNTY OF LOS ANGELES

| | |
|---|---|
| Gianni Nunnari et al. | ) Case No.: BC390245 |
| Plaintiffs, | ) Amended Judgment |
| vs. | ) |
| Cecchi Gori Pictures, Inc., et al, | ) |
| Defendants | ) |
| | ) |
| And Related Cross Action | ) |

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

MAY 9 - 2011

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
KAREN TAPPER

WHEREAS, the court in this matter issued a March 25, 2011 Statement of Decision following bench trial finding in favor of Defendants/Cross-Complainants Cecchi Gori Pictures, Inc. ("CGP") and Cecchi Gori USA, Inc. ("CGUSA") and against Plaintiffs/Cross Defendants Gianni Nunnari and Hollywood Gang Productions, LLC ("HGP");

WHEREAS, this court entered a March 25, 2011 judgment that contained an error in mathematical calculation;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

Plaintiffs/Cross Defendants shall take nothing by their First Amended Complaint.

On the First Amended Cross Complaint, the court enters an Amended Judgment in favor of Defendants/Cross Complainants CGP and CGUSA and against Cross-

1

Defendant Gianni Nunnari on the First Cause of Action in the Cross-Complaint for breach of employment agreement. The court enters an Amended Judgment in favor of CGP and CGUSA and against Nunnari and HGP, jointly and severally, on the Second, Third and Fourth causes of action for breach of fiduciary duty, fraud, and fraudulent concealment.

The court awards damages against Nunnari on the First Cause of Action and against Nunnari and HGP, jointly and severally, on the Second, Third and Fourth Causes of Action, in the amount of $15,834,200 calculated as follows: $13,226,125 in damages; plus $2,608,075 in prejudgment interest (at 7% per annum) (calculated as $2,085,554 through August 30, 2010 plus $522,521 from September 1, 2010 through March 25, 2011 ($2,536.51 per day for 206 days)); plus costs in the amount of $_____; and attorneys fees in the amount of $_____.

The court imposes a constructive trust in favor of CGP and CGUSA with respect to any and all profits, income and any other consideration that Plaintiffs/Cross Defendants receive, or are entitled to receive in connection with the projects and/or films entitled *300, Everybody's Fine, The Departed, Shutter Island, Hugo Cabaret, and Silence* (the "Films"). Plaintiffs/Cross Defendants shall be entitled to reimbursement from the constructive trust for (1) the reasonable value of future producer or other services that they may provide on the Films pursuant to agreements formed during the term of Nunnari's employment; and (2) reimbursement for reasonable future expenses, if any, attributable to their future performance under those agreements (including the obligation, if any, to pay attorneys' fees incurred in connection with litigation and settlement with the Scorsese parties in connection with *Silence).

The court orders Plaintiffs/Cross Defendants to account for all income and expenses in connection with the Films and to turn over to Defendants/Cross

2

1    Complainants originals of non-privileged documents and/or electronic data in their

2    possession, custody or control relating to the Films.

3       As a former employee, Nunnari continues to owe fiduciary duties to

4    Defendants/Cross Complainants with respect to the Films. The court therefore enjoins

5    Nunnari and HGP from performing, or otherwise taking action under any of HGP's

6    and/or Nunnari's Films-related agreements, without first obtaining CGP's and/or

7    CGUSA's written consent. In addition, Nunnari and HGP may not withhold signatures

8    or refuse to deliver any documents necessary to effectuate Defendants' rights under this

9    Judgment.

10      On the Tenth Cause of Action for Declaratory Relief, the court finds and declares

11    that CGUSA has never validly conveyed (or ratified any purported conveyance) to HGP

12    and/or Nunnari an option or any other ownership interest in CGUSA's intellectual

13    property rights to *Silence*. The court further finds and declares that Nunnari and/or HGP

14    never validly acquired an option or other ownership interest in such rights from CGUSA.

15    The May 1 2001 Option/Assignment of Rights Agreement between CGUSA and HGP

16    (the "2001 HGP Option") is void. Nunnari and HGP forfeit any rights in *Silence*

17    purportedly acquired from CGUSA under the 2001 HGP Option.

18      Aside from *Silence*, there is no present and justiciable dispute or controversy

19    between or among the parties as to ownership of intellectual property rights in any other

20    property at issue in Cross Complainants' Tenth Cause of Action.

21       Dated this 6th day of May, 2011

22

23                 Amy D. Hogue

24                 Judge of the Superior Court

25

3

Case: 16-53499    Doc# 160    Filed: 04/11/18    Entered: 04/11/18 11:03:15    Page 59 of 59