Michael H. Weiss (State Bar No. 107481)
mw@weissandspees.com
Laura J. Meltzer (State Bar No. 151889)
lm@weissandspees.com
WEISS & SPEES, LLP
6310 San Vicente Boulevard, Suite 401
Los Angeles, California 90048
Telephone: 424-245-3100
Facsimile: 424-217-4160

Attorneys for Creditor
Gabriele Israilovici

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| IN RE<br><br>CECCHI GORI PICTURES, CORPORATION, a California corporation, and<br>CECCHI GORI USA, INC. a California corporation<br><br>    Debtors. | Case No. 16-53499<br>Administratively consolidated with<br>Case No. 16-54500<br><br>Chapter 11<br><br>Judge: Hon. M. Elaine Hammond<br><br>**GABRIELE ISRAILOVICI'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO DISMISS CASE FOR CAUSE UNDER 11 U.S.C. §1112**<br><br>Hearing:<br>Date:  May 15, 2018<br>Time:  1:00 p.m.<br>Place: Courtroom 3020<br>       280 So. First St.<br>       San Jose, CA 95113-3099 |

Creditor Gabriele Israilovici hereby submits the following reply to the Debtors' Opposition to the Motion to Dismiss Case for Cause under 11 U.S.C. § 1112 (the "Opposition") [CGP Dkt. No. 175]:

## I. INTRODUCTION

The Debtors' well-crafted brief cannot conceal the absence of facts and admissible evidence in support of their Opposition to the Motion.[1] In particular, the Opposition offers no

---

[1] [CGP Dkt. No. 157]

evidence that a rehabilitation is reasonably in prospect. It only offers inadmissible hearsay. At best, the Debtors offer only liquidation. Current management possesses no skills that might allow for a better result than liquidation by a chapter 7 trustee. The notion that the Debtors' court-appointed counsel should "loan funds" to the Debtors from their retainer to pay U.S. Trustee is simply preposterous. Such a loan creates a clear conflict of interest that potentially violates both counsel's ethical duties (e.g., *Fraser v. State Bar*, 434 cal. 3d 564 (1987)) as well as the "disinterestedness" requirements of section 327 of the Bankruptcy Code.[2]

The entire premise of the Opposition is that the Debtors will sell some assets and those assets will generate funds to make a distribution to creditors. However, that assertion is unsupported with any evidence of value save vague speculations by the Debtors' present management. Taken as whole, the Opposition does not rebut with admissible evidence Mr. Israilovici's assertion that cause exists for either dismissal or conversion under section 1112.

## II. THE OPPOSITION PROVIDES NO EVIDENCE OTHER THAN SPECULATION THAT THE ESTATES ARE LOSING MONEY AND HAVE NO PROSPECT OF REHABILITATIONS.

### A. Rebating the Debtors' counsel's retainer does not show that the estates are notlosing money.

There is no cash coming into these estates. Yet, the combined estates continue to "burn" through about $625.00 per month in expenses and UST fees of $650.00 per quarter. De Camara Decl., ¶ 4.[3] If the most recent monthly operating reports (MORs")[4] are accurate, the estates will be without any cash to pay UST fees by August 31, 2018 for CGP and Jul 31, 2018 for CGUSA.

To circumvent this problem, the Debtors' counsel has agreed to "loan" to the estates funds from its retainer to pay UST Fees as well as the storage and banking fees. De Camara Decl., ¶ 5. Neither of the employment applications for the Debtors' counsel provided for this. Likewise, there is no order under section 364 allowing the Debtors' counsel make such a loan. Likewise, the Opposition presents no authority that the Debtors' counsel either has complied or can comply with

---

[2] Unless otherwise noted, all references to "section" refer to the applicable section of the Bankruptcy Code, 11 U.S.C. §§ 101, et seq.

[3] Dkt. No. 176.

[4] CGP Dkt. No. 169 and CGUSA Dkt. No. 53.

2

its ethical obligations by making such a loan or can remain "disinterested" under section 327 if it does make such a loan. This suspect "loan" might otherwise address whether there is "cause" under section 1112(b)(4)(K) for failure to pay UST fees. However, such cause is not the basis of the Motion. Certainly, if such fees were not timely paid, the Office of the United States Trustee would take prompt steps to move to convert or dismiss this case.

As noted in the Motion, "[t]he loss may be substantial or continuing. It need not be both in order to constitute cause under [section] 1112(b)(4)(A)." *Hassen Imps. P'ship v. City of W. Covina (In re Hassen Imps. P'ship)*, 2013 Bankr. LEXIS 3870, at *37 (B.A.P. 9th Cir. Aug. 19, 2013). At least as to the Debtors' cash assets, the losses have been both substantial and continuing.

B. **The prospect of a potential sale of the recovered scripts and projects or the payment due under the "Ferrari" contract is little more than speculation, and those possibilities are not evidence that the Debtors do not continue to lose funds.**

Certainly, if the Debtors manage to "close" on either the sale of the recovered assets[5] or the payment on the Ferrari contract,[6] there will be significant assets in these estates obviating the need for this instant motion.

However, the Opposition offers no *evidence* beyond hope and speculation that that these difficult transactions will materialize into funds to pay administrative expenses and creditors.[7] The Debtors' argument that there is no continuing diminution of the estates is based entirely on the *hope* that these payments will materialize. Opposition at p. 4; De Camara Decl. ¶ 11. As courts have noted, a debtor cannot defeat a motion under section 1112(b)(4)(A) merely on

---

[5] The term "recovered assets" means the assets that the Debtors recovered as constructive fraudulent transfers in Adv. No. 17-05007.

[6] The Ferrari contract is the one described in the Motion for Order Pursuant to 11 U.S.C. § 363 Authorizing the Debtors to Enter into Agreement with Forward Pass, Inc. Re Ferrari Project. [CGP Dkt. No. 146]

[7] Certainly, the hope of a recovery in litigation either from Messrs. Israilovici and Nappi in Adversary No. 17-5084_ or from some legal malpractice claim against Berlandi, Nussbaum & Reitzas, LLP is the type of speculation that that will not survive a motion to dismiss under section 1112(b)(4)(A). *Quarles v. U.S. Trustee*, 194 B.R. 94, 98 (W. D. Va. ), affirmed, *Quarles v. Miller*, 86 F.3d 55 (4th Cir. 1996) (the "premise that outcomes in pending litigation favorable to him will cure [its] financial ills [**7] is pure speculation.") Id. at 96-97

speculation. Such opposition must be based on concrete evidence that the unliquidated assets or business opportunities of the estates will be turned into cash in some reasonable period of time. Under Fed. R. Evid. 701 or 702, Mr. DeCamara's declaration provides no admissible of if, let alone when, the Debtors might enter into a meaningful contract to sell the recovered assets or receive any funds in connection with the "Ferrari" project. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993) ("subjective belief or unsupported speculation is inadmissible.")

At this juncture, the Debtors' evidence is no more than rank speculation shrouded in innuendo and mystery. For example, the Debtors submit the following to show that the estates will have cash to propose a plan:

> 8. The Debtors, having recovered the film projects, are in the process of monetizing those projects. That process is in its early stages. I have determined that initially the Debtors will seek out a stalking horse bidder by making targeted inquiries from a small group of potential purchasers. That targeted process is likely to continue for the next 90 days, with assistance from Mr. Juul. In the event a stalking horse bidder is not obtained in this manner by the time 90 days have passed, the Debtors will shift gears and cast a much wider net in order to attract a lead bidder. This second, much more robust outreach, will also likely last for 90 days, to the extent it is needed at all. If the assets cannot be sold together in a single package, the Debtors will evaluate other vehicles for their monetization. De Camara Decl. ¶8
>
> While the Debtors believe it would be harmful to the process to disclose the purchase price under discussion, they can disclose that the prices being discussed by potential buyers for the film projects are in an amount that would cover all administrative expenses in the estates and result in a distribution to general unsecured creditors. In addition, the Debtors believe the new agreement the Court recently authorized the Debtors to enter into regarding the Ferrari project would tend to increase the value of the film project assets. Taking into account the value of the film projects, the Debtors believe that the assets of the estates have increased in an amount more than making up for any negative cash flow. Id. ¶ 10.

Conspicuously, the "testimony" of Mr. De Camara asks the Court and creditors to trust that he has a realistic marketing process in place even though his declaration does not even attempt to address the concerns expressed in the Motion about his lack of experience in dealing with assets such as these. Motion at 10:3-12. Likewise, the declaration of the Debtors' consultant, Mr. Juul, does not explain how he has any meaningful experience trying to monetize the "recovered assets." He claims substantial experience in dealing with "branding issues." Juul Decl., ¶ 3-5. His

declaration offers no explanation how that experience meaningfully translates to his ability to monetize the assets. So, the Debtors are left with inexperienced managers to market and monetize difficult assets. In particular, Mr. De Camara fails to describe, let alone to identify the potential buyers, state the amount the offers, specify what conditions might be imposed in any such offers and when those offers might finally turn into cash. Likewise, the Debtors' evidence is at best vague if the recoveries will generate enough to pay administrative expenses, which already exceed $585,000. [CGP Dkt. No. 169 at p. 1.] As such, the Debtors' proposed "plan" to monetize the "recovered assets" is little more than a visionary scheme that relies upon inexperienced managers to effectuate it.

### C. The Opposition offers no evidence that the Debtors will or can return to their business of developing and producing motion pictures.

The Debtors clearly plan to sell their assets. De Camara Decl., ¶¶ 8-10. A liquidation of the Debtors assets either through a liquidating plan or by a chapter 7 trustee is not a "rehabilitation" under section 1112(b)(4)(A). E.g., *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) ("Because the debtors here [intend] to liquidate their assets rather than restore their business operations, they [have] no reasonable likelihood of rehabilitation.") Mr. De Camara throws a bone at the possibility of reorganization when he states: "The Debtors have not completely ruled out a true reorganization centered on a revival of its business." While there might be a hope of reviving Debtors' business residing in the back of Mr. De Camara's mind, there is no evidence in the Opposition of any facts that show that the Debtors have a concrete and feasible plan to revive the Debtors' business of developing and producing motion pictures.

### III. OTHER THAN A VAGUE DISCUSSION OF SOME SORT OF YET TO BE DESCRIBED SALE PROCESS, THE DEBTORS OFFER NO EVIDENCE THAT A REORGANIZATION IS IN PROSPECT.

The Opposition makes clear that the Debtors intend to sell their assets and try to recover assets through litigation to pay creditors through liquidation. De Camara Decl., ¶ 11. Certainly, a liquidation plan is permissible under section 1123(b)(4). However, such liquidation would invariably contemplate a sale of the recovered assets free and clear of liens and interests under section 363(f). Id. To be effective, any such sale would need to give notice to all persons

claiming any rights in and to the "recovered assets." *In re Griffin*, 509 B.R. 864, 895 (Bankr. W.D. Ark. 2014) ("If proper notice under § 363 is not given to an affected lienholder, a transferee takes the property subject to the [rights] of that unnoticed party. The burden of furnishing notice of the proposed transfer to all entities holding [such rights], as well as to any parties whose pecuniary interests might be directly and adversely affected by the transfer, is on the trustee or debtor in possession."); *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indust., Inc.)*, 43 F.3d 714, 720-21 (1st Cir. 1994)).[8]

To determine who actually might have rights in the "recovered assets," the Debtors need a chain of title report. [Movant's Ex. "N" at p. 255] As noted in the Motion, this problem makes a sale of the assets very difficult and the Debtors do not have the funds to acquire such a report. [Id.] The likely result is that the "recovered assets" will not be sold or will be sold at a significantly depressed price to account for the lack of clear title. [Id.]. As a result, there may not be sufficient funds to pay administrative or priority claims to allow confirmation. Moreover, this case should not be run just as a vehicle to professionals. Likewise, the ability to confirm plan based on recoveries from the litigation against Messrs. Israilovici and Nappi or Berlandi, Nussbaum & Reitzas is entirely speculative and gives the Court no sense of when or how a plan might be effected in an orderly and timely fashion. *Quarles v. U.S. Trustee*, 194 B.R. at 96-98.

### IV. THE OPPOSITION FAILS TO REBUT MOVANT'S CLAIM OF GROSS MISMANAGEMENT.

#### A. The Opposition does not exonerate Niels Juul's involvement in the Nunnari Settlement but instead confirms it.

The focus of the Opposition on the issue of gross mismanagement is the assertion that Messrs. Israilovici and Nappi were intimately involved in effecting the Nunnari Settlement and payments to Daro.[9] Opposition at p. 10-15; Kelly Decl. pp. 15-19. This argument is simply a ruse to deflect attention from Mr. Juul's deep involvement in that settlement and the assignment

---

[8] Even if notice by publication would suffice, there is no evidence that the Debtors have the funds to give notice to the proper parties and in such a manner to effectively give such notice.

[9] Their involvement is the subject of a pending adversary proceeding, Adv. No. 17-05084. In connection with that adversary proceeding, Messrs. Israilovici and Nappi deny all liability arising from the Nunnari settlement and the disposition of the proceeds therefrom.

of Daro payment. His involvement is demonstrated by his lengthy email to Messrs. Israilovici and Nappi dated March 30, 2012. (Kelly Decl., Exhibit "4" at p. 15-19.) In that email dated March 30, 2012, Mr. Juul expresses his reservations about VCG's desire to use the Daro and Nunnari proceeds as he saw fit. Id.

Despite these reservations, Mr. Juul did a complete about face and signed the Nunnari settlement and executed the instructions transferring the funds to Canada. (Movant's Exs. "C" at p. 66 and "S" at p. 332.) Upon doing so, he received between $580,000 and $745,000 of the settlement proceeds. (Movant's Ex. "R" at p. 286.) Likewise, as to Daro, Mr. Juul signed the "Acknowledgement and Agreement on June 15, 2012 verifying the transfer of the Daro assignment to Shiba. (First Amended Complaint in Adv. No. 17-05084 [Adv. Dkt. No. 24], Ex. "D" at p. 37). Neither the Debtors nor Mr. Juul dispute these facts, and the Opposition simply ignores them. More importantly, none of this is disclosed to the Court and creditors in connection with the Debtors' application to employ Mr. Juul.

**B. The Opposition provides no evidence that Niels Juul was authorized to make payments totaling $1,335,264 during the pendency of his Executive Producer Agreement.**

Mr. Juul obtained access to the Debtor's accounts because he was listed on the account signature cards as their secretary. As their secretary, he was a fiduciary to them. E.g. *Pigeon Point Ranch, Inc. v. Perot*, 59 Cal. 2d 227, 233 (1963) ("officer of a corporation acts in a fiduciary capacity, and the law does not allow him to secure any personal advantage as against the corporation."). Thus, Mr. Juul has the burden to demonstrate that the payments he authorized were proper. *Jones v. H. F. Ahmanson & Co.*, 1 Cal. 3d 93, 108 (1969) ("[an officer] is a fiduciary . . . [His or her] powers are powers of trust. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein . . .). Nothing in the Opposition even attempts to meet this burden.

Rather, the only evidence the Debtors submit on this point is the following:

14. Following Israilovici's previous allegations that Mr. Juul

> misappropriated the Debtors' funds, the Debtors followed up with KPMG to investigate. That follow-up included direct discussion between Sheppard Mullin and internal counsel for KPMG, and led me to conclude that the KPMG report did not demonstrate misconduct on the part of Mr. Juul. As a result, the Debtors determined no disclosure was necessary regarding that matter.

This is simply not admissible evidence. The statements of Debtors' counsel are hearsay. The statement of KPMG's counsel to the Debtors' counsel is hearsay and lacks foundation because that statement is not even based on personal knowledge of the person who prepared the report.

Under his executive producer agreement dated December 15, 2012, Mr. Juul ceased to be an officer of the Debtors, nevertheless and apparently without notice to VCG or Mr. Israilovici, Mr. Juul retained control over the bank account of the Debtors, allegedly in his role as "secretary." (Movant's Ex. "R" at pp. 288 and 309.) After his role as CEO was terminated, Mr. Juul operated under the terms of the Executive Producer Agreement dated December 15, 2012. (Attached hereto as Movant's Exhibit "W"). That agreement provided:

> If there are costs. such as travel, consulting services or administrative costs, NFE need to secure prior approval of such costs by the CG Entities. CG Entities will reimburse NFE for approved costs, within the same calendar month of the expenses occurring.

From January 27, 2012 until December 23, 2014, Mr. Juul authorized the transfer of $1,335,624 from the Debtor accounts. (Movants' Ex. "T" at pp. 358-412.) Of that amount transferred during that period, $339,952 was transferred to Mr. Juul personally or his company Nofatego, LLC. (Id. at pp. 358-415)[10] Mr. Juul does not deny that he had control over the Debtors' accounts. However, the Opposition does not claim that the Debtors or Mr. Israilovici ever authorized any of those payments.[11] Most importantly, his testimony does not refute his concealment of his control over the Debtors' accounts from VCG and Mr. Israilovici. The Debtors' continued association

---

[10] These payments are summarized in Exhibit "Y".

[11] Though the Opposition makes no reference to this, Mr. Juul did submit a declaration in connection with Adv. No. 17-05007 in which he claims that all of these payments save one or two were authorized by Mr. Israilovici. 5007 Adv. Dkt. 8 at ¶33, p. 7] However, Mr. Juul is no more than an agent of the Debtors and the fact and scope of his agency cannot be proved by his testimony but by the testimony of Mr. Israilovici or VC. *Dill v. Berquist Constr. Co.*, 24 Cal. App. 4th 1426, 1437, 29 Cal. Rptr. 2d 746, 752 (1994) ("An extrajudicial statement of a person that he or she is the agent of another is not admissible to prove the fact of agency unless the statement is either made in the presence of or communicated to the principal and the principal acquiesces in that statement.") There is no evidence of any contemporaneous statement by VCG or Mr. Israilovici indicating that the scope of Mr. Juul's agency allowed any of the payments identified in the KPMG report.

with Mr. Juul remains inexplicable except for generalized statements about his honesty and support.  De Camara Decl. at ¶ 13.

## V. CONCLUSION: DISMISSAL IS BEST.

As stated in the Motion, Mr. Israilovici submits that there is ample cause for dismissal or conversion.  He still believes that dismissal is best and that if the Debtors are right about their claims against Messrs. Israilovici and Nappi, those claims will survive any dismissal.

Dated: May 8, 2018

WEISS & SPEES, LLP
/s/ *Michael H. Weiss*
Michael H. Weiss
Attorneys for Creditor and Moving Party
Gabriele Israilovici